**UNITED STATES of America,**

v.

**Corey JONES and Jason Jones, Defendants.**

**No. 00 CR. 1226(GEL).**

United States District Court, S.D. New York.

June 29, 2001.

Adam B. Siegel, Assistant United States Attorney, New York, New York (Steven Glaser, Assistant United States Attorney, Mary Jo White, United States Attorney for the Southern District of New York, of counsel), for United States of America.

Charles D. Adler, Goltzer & Adler, New York, New York, for Defendant Jason Jones.

## OPINION AND ORDER

LYNCH, District Judge.

Defendant Jason Jones was indicted on November 28, 2000, on one count of conspiracy to distribute, and possess with the intent to distribute, more than five grams of crack cocaine, in violation of 21 U.S.C. § 846. On May 23, 2001, the Court conducted an evidentiary hearing regarding defendant's motion to suppress a firearm discovered during a warrantless search of his residence following his arrest by law enforcement officers on November 29, 2000, and a non-verbal testimonial statement he made after the officers failed to advise him properly of his constitutional rights, as was required by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and reaffirmed in *Dickerson v. United*

*States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

For the reasons that follow, the motion is denied.

### Facts

Three law enforcement officers testified at the hearing; defendant called no witnesses. After evaluating the credibility and demeanor of the witnesses, and the other evidence offered at the hearing, I make the following findings of fact.

Detective Andrew Huber, a fifteen-year veteran of the New York Police Department and, at the time of the events in question, a member of the department's Bronx Narcotics Division (Tr. 3–4), testified that on November 29, 2000, at around 6:00 a.m., approximately 7–10 federal and city law enforcement officers arrived at Jones' apartment at 1074 Summit Avenue (# 4A) in the Bronx with a warrant to arrest him on narcotics charges. (*Id.* 6–11, 18, 22.) The arrest raid was part of an operation that targeted approximately 18 people for arrest that day in the area surrounding the Highbridge housing projects. (*Id.* 5–6.) Huber, pretending to be an employee of New York City's Bureau of Child Welfare, had previously entered the apartment on a "reconaissance" mission to ascertain its layout and learn how many individuals could reasonably be expected to be present at the time of the raid. (*Id.* 7–10.) When they arrived at the apartment to effect the arrest, Huber and the other officers were aware, based on statements made "months before" by a confidential informant, that Jones had illegally sold firearms to the informant in the area around his apartment. (*Id.* 6–7, 9, 33, 46.) Believing (based on Huber's observations

on his earlier visit) that a young child probably resided in the apartment, members of the raid team planned to question inhabitants about whether firearms were stored there. (*Id.* 9, 42–43.) The government, however, did not obtain a search warrant in advance of the raid. (*See, e.g., id* 40–41.)

Defendant's apartment consists of a central living room, located to the left of the entranceway, with an adjacent kitchen. Two bedrooms (left and right) are located to the rear of the living room. (*Id.* 11.) On November 29, 2000, the officers, all of whom were carrying firearms and wearing bulletproof vests and blue jackets (*id.* 22–23), knocked at the front door and announced their presence to Hodell Cromer, defendant's father. After being informed that the officers had an arrest warrant for Jones, Cromer led them down a hallway to the right bedroom, where they discovered defendant (who had apparently just awakened). (*Id.* 11–12.). The officers handcuffed Jones outside of the bedroom (*id.* 14), and Huber, after telling him that he was under arrest, informed him that "you don't have to talk to me; you have a right to a lawyer, but I know there are guns in the apartment, tell me where they are." (*Id.* 13.) Huber also testified that he "implor[ed]" Jones to make a statement about the putative firearms "so nobody gets hurt." (*Id.*) At no time during his interrogation of Jones did Huber unholster his firearm. (*Id.* 17.)[1]

While Huber was speaking to Jones, other officers conducted a limited security sweep of his bedroom. Louis Milione, a Special Agent of the Drug Enforcement Administration ("DEA") who participated in the raid, testified that he looked into an

---

1. During this questioning, Cromer was nearby, behind Huber. Although he failed to note the remark in a report prepared following the raid (*id.* 39), Huber testified at the hearing that Cromer told him and some other officers within earshot that they could "look anywhere [they] want" because "we have nothing to hide." (*Id.* 14.)

open closet space in the bedroom, and discovered ammunition stored in an open container. (*Id.* 49–50; GX 2.) Milione testified that he then joined Huber and confronted Jones with this information, asking "where is the gun that goes with this?" (Tr. 50.) Eventually, "[a]ter asking him and pleading with him to tell me where it was, while he was being handcuffed after being dressed," Huber persuaded Jones to tell him where the gun was. (*Id.* 14.) Jones "said all all right," and then led the officers into the living room, and nodded his head in the direction of a couch. After searching the couch, the officers discovered a "Tec 9," a semi-automatic firearm, with the magazine dislodged (*id.* 52), stashed under one of the cushions. (*Id.* 15, 51; GX 1.) Jones was then asked if other guns were present in the apartment, but he did not respond. (*Id.* 16.)

As Huber and Milione were questioning defendant, some of the other team members, including Special Agent Edward Segar of the DEA, converged on Shirley Jones (defendant's mother) and a small child, who were located in the left bedroom. Segar conducted a "quick" security sweep of the room while holding his firearm. After completing the sweep, he holstered the weapon and spoke to Ms. Jones, who was somewhat "flustered" by the massive law enforcement presence in her apartment. (*Id.* 74.) Segar asked Ms. Jones if her name "was on the lease" for the apartment. She said it was. Segar then asked if he and the other officers could "look[ ] around." (*Id.*) Ms. Jones orally consented, stating that there "was nothing to hide, nothing in the apartment, no drugs." (*Id.* 75.) Approximately two minutes elapsed between the officers' en-

tering the apartment and Ms. Jones' oral consent to search. (*Id.* 77.) Segar immediately communicated news of the consent to other members of the arrest team. (*Id.* 77–78; *see also id.* 66.) At some later point, an unidentified officer handed Ms. Jones a consent to search form. (*Id.* 78; GX 3.) Jones agreed to execute the form, and did so in the presence of Agent Milione. (Tr. 63–64.) During a subsequent search, the officers discovered additional firearms. (*Id.* 66.)

The sequence of these events is not completely clear from the testimony. Apparently, Huber and Milione were talking to Jones in his bedroom at the same time that Segar was speaking to Jones' mother in hers. None of the officers clearly recalled whether Segar's announcement that Ms. Jones had consented to a search preceded or followed the discovery of the Tec 9 in the living room. However, Segar testified that Ms. Jones gave her oral consent "within two minutes of the time he entered her room". (*Id.* 77.) Huber and Milione, in contrast, described their interrogation as a lengthier process, in which defendant was cajoled to agree to reveal the location of the firearm while he rose and dressed. It is clear that the written consent form was not signed until after the Tec 9 was found, though it is less clear whether the signing preceded or followed the seizure of other firearms.

*Discussion*

I. *The Firearm*

Defendant first moves to suppress the semi-automatic firearm that officers located under the cushions in a living room couch in his apartment. (D.Br.1–2.)[2] The

---

2. The government has represented that it does not intend to offer into evidence any of the other firearms seized in the apartment. Therefore, the instant motion concerns only

the single Tec 9 firearm found in the couch. To the extent that defendant's motion can be interpreted as also addressed to the ammunition found in his closet, that evidence was

government concedes that the officers did not have a warrant to conduct a search of the premises, but maintains that the evidence is admissible because both defendant and his mother, the lessee of the apartment, voluntarily consented to a search.

■■■ Warrantless searches are presumptively unconstitutional. *See, e.g., Maryland v. Dyson,* 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam). Such searches are nevertheless lawful under a variety of circumstances. Among these, it is well established that a person may consent to a search if the consent was "freely and voluntarily given" under the "totality of all the surrounding circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal quotations omitted). Factors that courts consider in assessing the voluntariness of a consent include the individual's age, intelligence and educational background, the length and nature of the questioning and whether the law enforcement officials engaged in coercive behavior. *Id.* at 226–27, 93 S.Ct. 2041.

The government first contends that Jones himself consented to a search of the couch. (G.Br.25–26.) But the testimony about what Jones did and said is quite minimal. According to Huber, after extensive efforts to persuade him to reveal the location of the gun for the safety of his family, Jones said "all right," and then "led [Huber] back into the living room area to the vicinity of the couch, . . . stood in front of the couch and nodded towards the couch." Huber asked, "here?," and Jones "again nodded toward the couch." (Tr. 14–15.)

■■ The government argues that defendant's nods in the direction of the couch constitute both a factual statement about the location of the firearm and a consent for the officers to look under the cushions. Defendant argues that telling the agents where the gun was located is not the same thing as consenting to a search that would otherwise not be permitted by the Fourth Amendment. While the government's interpretation is certainly plausible, and there is no doubt on this record that Jones' non-verbal responses—whatever they meant—were voluntary, there is no need in this case to decide whether a nod by an 18–year–old man made in response to a request for information rather than to an explicit request for consent to search is sufficient to constitute a free and voluntary waiver of a constitutional right. For there is no question that the agents obtained a fully satisfactory consent to search from defendant's mother.

■■ The evidence conclusively establishes that Ms. Jones' consent to search the apartment was freely and voluntarily given. According to Segar, whose testimony I find credible, approximately two officers entered Shirley Jones' bedroom. (Tr. 73.) They did not unholster their firearms during the interrogation or make any overtly threatening or coercive gestures toward her, and questioned her for no more than approximately two minutes. (*Id.* 74, 75, 77.) Although she was "flustered" by the raid, Ms. Jones, a mature woman, was calm while answering the officers' questions about, for example, whether her name was on the lease for the apartment (it was), and whether she would assent to a search of the premises (she did, saying that there "was nothing to hide"). (*Id.* 74–75.) Nor can it be argued that her consent was influenced in any way by the

discovered in a valid security sweep, see *Segura v. U.S.,* 468 U.S. 796, 104 S.Ct. 3380, 82

L.Ed.2d 599 (1984), and is therefore also admissible.

interrogation of her son or the discovery of the Tec 9 in the living room. Even if those events preceded her consent (and I find that it is more likely than not that they did not), Segar and Ms. Jones were in her bedroom at the time of the consent, and the record supports the conclusion that neither the living room nor defendant's bedroom could be seen or heard from their vantage point in her room. (*Id.* 75.) [3]

Although there is some ambiguity in the officers' testimony concerning whether Shirley Jones gave her consent (either oral or written) prior to the discovery of the various guns throughout the apartment, I find that the government has proven by a preponderance of the evidence that Ms. Jones consented to a search before Huber searched the couch in response to defendant's nod. The officers secured her oral consent very quickly after entering the apartment (about two minutes after entering her bedroom) (*id.* 77), making it more likely than not—given the time it took for the officers to rouse defendant, allow him to dress, and handcuff and interrogate him—that the consent was obtained before the discovery of the firearm in the living room couch. Consequently, the Court concludes that Ms. Jones knowingly and voluntarily gave oral consent to the officers before the firearm was discovered, giving the officers a legal basis to search the couch independent of any purported consent by defendant.[4]

 Alternatively, I find by a preponderance of the evidence that even if the consent had been obtained after the couch was searched and the gun seized, the firearm would still be admissible under the inevitable discovery doctrine set forth by the Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Under this principle, if the government can prove by a preponderance of the evidence that the gun "would have been discovered by lawful means," *id.* at 444, 104 S.Ct. 2501, it is admissible, even if the original search was unlawful. As discussed above, the government has clearly proven that the agents obtained a valid oral (and, subsequently, written) consent from Shirley Jones to search the apartment. On the basis of this consent, the agents proceeded to conduct a thorough search of the entire apartment, locating a number of other weapons. It is inconceivable that competent officers, conducting such a search, would not have looked under the couch cushions and discovered the Tec 9. I therefore find that if Huber had not searched the couch pursuant to his conversation with Jones, the agents would undoubtedly have discovered the semi-automatic firearm through lawful means, incident to Ms. Jones' consent.

For the foregoing reasons, defendant's motion to suppress the firearm is denied.

## II. *The Statement*

Defendant also moves to suppress his post-arrest "statement," which consisted of his nods in the direction of the couch after being asked by Detective Huber about the location of any firearms in the apartment.[5]

---

3. The absence of testimony from Ms. Jones, or from any other occupant of the apartment, further bolsters the credibility of the agents' account.

4. The government does not seek to rely on the purported consent of Hodell Cromer. In light of the above analysis, there is no need to address whether that consent was given,

whether Cromer had the authority to give it, and whether it was voluntary.

5. Of course, the statement has evidentiary significance independent of the seizure of the gun itself, since Jones' statement links him specifically to the weapon.

He contends that because the officers failed to read him a complete set of *Miranda* warnings following his arrest, any testimonial statement[6] made thereafter was in violation of his Fifth Amendment right against self-incrimination. (D.Br.2–3.)

In its opposition papers, the government concedes that Jones was not properly Mirandized, as Detective Huber failed to inform him of his right to be appointed counsel and that any statement he elected to make to the officers could later be used against him at trial. (G.Br.19–20.) However, the government argues that the statement is nevertheless admissible, pursuant to the public safety exception to *Miranda* announced by the Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). (*Id.* at 20–21.)

### A. *Quarles*

The facts presented in *Quarles*, however, presented a far more pressing public safety exigency than those of the instant case. Shortly after midnight on September 11, 1980, a woman approached a police patrol in Queens. The woman told the two officers that an African–American male had raped her, and then fled the crime scene on foot before entering a supermarket. She gave a detailed description of the perpetrator, and advised the officers that he was carrying a firearm. 467 U.S. at 651–52, 104 S.Ct. 2626. Upon entering the supermarket, the officers observed Quarles, who fit the victim's description. Quarles saw the officers and fled toward the back of the store. The police immediately pursued him, and after a few seconds, Quarles was apprehended and frisked. No gun was found, but the officers observed that Quarles was wearing an empty shoulder holster. An officer handcuffed him and, without giving *Miranda* warnings, "asked [Quarles] where the gun was." *Id.* at 652, 104 S.Ct. 2626. Quarles nodded his head toward "some empty cartons" and said, "the gun is over there." *Id.* The officer searched the cartons and discovered a .38–caliber revolver. At that point, Quarles was notified that he was under arrest, and the police proceeded to Mirandize him. *Id.*

The state courts suppressed Quarles' statement because he had not received *Miranda* warnings prior to making it. *Id.* at 652–53, 104 S.Ct. 2626. The Supreme Court, in a 5–4 decision by then-Justice Rehnquist, reversed. After an introductory section suggesting that *Miranda* warnings were a judicially-created prophylactic measure and "not themselves rights protected by the Constitution," *id.* at 654, 104 S.Ct. 2626 (internal quotations omitted),[7] the Court announced a new exception to *Miranda*:

> We hold that *on these facts*, there is a "public safety" exception to the require-

**6.** The parties agree that Jones' non-verbal gestures constitute a testimonial statement. There is also no dispute that Jones was in custody, and that he was responding to interrogation.

**7.** Writing for the majority in *Dickerson*, Chief Justice Rehnquist disavowed the implication in *Quarles* and other opinions of its vintage that the *Miranda* warnings are not mandated by the Self–Incrimination Clause of the Fifth Amendment:

> These decisions illustrate the principle—not that *Miranda* is not a constitutional rule—but that no constitutional rule is immutable. No court laying down a general rule can possibly foresee the various circumstances in which counsel will seek to apply it, and the sort of modifications represented by these cases are as much a normal part of constitutional law as the original decision. *Dickerson*, 530 U.S. at 441, 120 S.Ct. 2326. However, there is no suggestion in *Dickerson* that *Quarles* and other exceptions to *Miranda* have been overruled.

ment that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved. In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer.

*Id.* at 655–56, 104 S.Ct. 2626 (emphasis added).

In carving out what it noted as "a narrow exception to the *Miranda* rule *in this case*," *id.* at 658, 104 S.Ct. 2626 (emphasis added), the *Quarles* Court took care to note the exigencies of the situation facing the arresting officers, including "the immediate necessity of ascertaining the whereabouts of a gun" that Quarles had removed from his holster and tossed aside in a public place where "an accomplice might make use of it" or "a customer or employee might later come upon it." *Id.* at 657, 104 S.Ct. 2626. In light of such a potential danger to public safety, the Court held, informing Quarles about his *Miranda* rights might have discouraged him from making statements to the police that would enable them to locate the firearm before it could pose a danger to the public at large. *Id.*

Although the *Quarles* Court made reference throughout the opinion to the narrowness of the "public safety" exception and its apparent limitation to the facts of the particular case, other language in the opinion suggests that the Court foresaw a potentially broader application of the new constitutional rule. For example, in clarifying that police officers could not employ the exception as a license to conduct an unfettered testimonial interrogation of a suspect who has not been read his *Miranda* rights, the Court noted that it would be acceptable for officers to ask "questions necessary to secure their own safety or the safety of the public." *Id.* at 658–59, 104 S.Ct. 2626. Moreover, the Court predicted that the exception would "free [officers] to follow their legitimate instincts when confronting situations presenting a danger to the public safety." *Id.* at 659, 104 S.Ct. 2626. The Court's opinion in *Quarles* thus leaves considerable uncertainty as to whether the Court intended its holding to be confined to the narrow factual circumstances of the case or, instead, to provide law enforcement officials with broader latitude to conduct limited custodial interrogations anytime public safety concerns are implicated.

This uncertainty is significant, since the facts of the instant case do not suggest the same sense of exigency as those that were held in *Quarles* to justify a limited custodial interrogation without *Miranda* warnings. Police officers apprehended Quarles in a public place, in immediate pursuit following a crime committed with a handgun just minutes earlier. They had compelling reason to believe that Quarles, who was wearing an empty gun holster, had discarded his firearm in an area in which it could easily be discovered by members of the general public. Moreover, having little information about Quarles or the crime, they could not rule out the possibility that friends or confederates of Quarles might be present in the supermarket, who might have access to the firearm and present a danger to the officers. 467 U.S. at 657, 104 S.Ct. 2626.

Here, in sharp contrast, the law enforcement team engaged in a controlled, carefully planned arrest raid of defendant's private home. The officers easily secured

the apartment and its inhabitants (Tr. 11–12, 19), and the government does not suggest that they had any fear of being in harm's way, or concern that any weapons in the apartment might be used against them. Moreover, unlike the officers in *Quarles,* who knew to a virtual certainty that the suspect had discarded his gun in a public area, the officers here had far staler and shakier grounds to believe that a gun was present. The primary basis for their belief was information from a confidential informant, provided months earlier, that Jones and/or his brother sold or attempted to sell firearms "in or around" the apartment. (Tr. 31–34.) Also unlike *Quarles,* the officers here had no cause to worry that a member of the general public could find a discarded firearm. While the officers had some objective basis for concern that any firearm left behind in the apartment could endanger the welfare of the young child who resided there, there was no particular reason to believe—as there was in *Quarles*—that any gun that was kept in the apartment was simply lying around in a place accessible to a child. At any rate, official concern for the safety of the apartment's other residents had evidently lain dormant for many months after the police learned that weapons may have been present in the apartment, while the investigation continued.

Thus, it is far from clear that *Quarles* controls this case. Nothing in the Supreme Court's opinion justifies a conclusion that officers are free to question the suspect about weapons before advising him of his rights whenever they arrest someone who has been implicated in possible firearms violations, or who has been seen at some prior time with a gun. Such a conclusion would blow a huge hole in *Miranda*'s protection against coercive interrogation, and would be completely inconsistent with the Court's statement that *Quarles* creates only a "narrow exception"

to *Miranda.* 467 U.S. at 658, 104 S.Ct. 2626. Indeed, the Court recognized as much, by reaffirming its earlier holding in *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). In that case, officers went to a suspect's apartment only a few hours after a handgun murder, and interrogated him, among other things, about whether he owned a gun. The *Quarles* Court pointed out that in that situation, the questions about the gun were impermissible because "they did not in any way relate to an objectively reasonable need to protect the police or the public from any *immediate* danger presented by the weapon." 467 U.S. at 659 n. 8, 104 S.Ct. 2626 (emphasis added).

The Court, however, has not had further occasion to explicate the boundary between exigent questioning in the interest of the public safety and ordinary investigatory questioning. To determine the boundaries of *Quarles,* then, it is necessary to consult its application by lower courts.

**B. Second Circuit Cases Applying Quarles**

The Second Circuit has had few opportunities to apply *Quarles.* In *United States v. Khalil,* 214 F.3d 111 (2d Cir. 2000), police officers questioned an accused terrorist, without benefit of warnings, about the mechanics of a bomb that had been discovered in his apartment, "concerned that the bomb would explode before they could disarm it." *Id.* at 115. The defendant understandably did not even contest the applicability of *Quarles* in this extreme situation, except to object that *Quarles* did not justify asking whether he intended to kill himself while bombing terrorist targets. The Court of Appeals noted that it was "inclined to disagree" with the appellant's argument, because his "vision as to whether or not he would survive his attempt to detonate

the bomb had the potential for shedding light on the bomb's stability." *Id.* at 121.

The Court's only other decision addressing *Quarles, United States v. Anderson,* 929 F.2d 96 (2d Cir.1991), distinguished *Quarles* in finding that the public safety did not justify deceptive or coercive tactics used to enlist an arrested drug conspirator's cooperation in preparation for executing a search warrant. But in that case, the suspect *had* been read his *Miranda* rights, and the question was whether the agent had coerced him by telling him that he would lose his opportunity to cooperate with the government if he asked for an attorney. The Court found that no exigency justified the use of such coercive and deceptive statements. *Id.* at 100.

These cases do little to test the limits of the *Quarles* exception. In *Khalil,* the exigent risks to public safety were more extreme even than in *Quarles* itself, and the Court made clear that the acceptability of the questioning was to be tested in light of its relevance to that exigency. *Anderson* confirms that the mere fact that an agent asks about guns, 929 F.2d at 97, does not justify otherwise unlawful interrogation, but in that case the disapproved tactics were arguably more coercive than simply omitting warnings, and the Court noted the fact that the agent had actually given *Miranda* warnings as supporting its finding of lack of exigency.

## C. *Cases from Other Circuits*

Other courts of appeals, however, have applied *Quarles* in situations well beyond its facts. A broad survey of decisions by those circuits that have construed *Quarles* reveals a strong majority tendency to apply the public safety exception in situations that go far beyond the "loose weapon" scenario of *Quarles* and *Khalil. See, e.g., United States v. Shea,* 150 F.3d 44, 47–48 (1st Cir.1998) (bank robbery suspect asked whether he had weapons or needles after being arrested and in anticipation of search incident to arrest); *Fleming v. Collins,* 954 F.2d 1109, 1112–1114 (5th Cir. 1992) (en banc) (officer asked wounded bank robbery arrestee who had shot him and who was with him; situation was "volatile"); *United States v. Brady,* 819 F.2d 884, 887–88 (9th Cir.1987) (officer responding to report of man beating woman asked if arrested suspect had a gun; court acknowledged distinctions from *Quarles* including "no indication that [suspect] possessed a weapon [or] had placed an unguarded weapon in a public place" and "extended" questioning; officer was trying to "control ... a dangerous situation" involving gathering crowd).

Moreover, several courts have expanded the scope of the exception to non-exigent circumstances in which there was little reason to believe that the public safety was endangered. For example, in *United States v. Edwards,* 885 F.2d 377 (7th Cir. 1989), Edwards and his passenger were arrested on narcotics charges, handcuffed and frisked. After frisking the suspects, and before reading them their rights, one of the arresting officers asked Edwards if he had a firearm. Edwards replied, "[w]hat do I need a gun for," adding that he was en route to a restaurant. *Id.* at 380. The Seventh Circuit affirmed the admission of his statements, holding that because "drug dealers are known to arm themselves," the officers had an "objectively reasonable need" to protect themselves "from the immediate danger that a weapon would pose." *Id.* at 384 & n. 4. Far from having any reason to believe that weapons were present, the officers had already frisked Edwards and his companion and found no guns, and the handcuffed suspects no longer could pose a danger to the officers.

In *United States v. Williams,* 181 F.3d 945 (8th Cir.1999), Williams was arrested at his apartment on narcotics charges. After securing the premises, the officers, who had a search warrant for the apartment, handcuffed Williams, who had not yet been advised of his rights, and asked him, "is there anything we need to be aware of?" Williams told them that there was a gun in a closet. *Id.* at 947. The Eighth Circuit affirmed admission of the statement, even though the apartment had been secured (*id.* at 948), and the only information suggesting the presence of weapons was the usual assumption about narcotics dealers, and the fact that Williams had "at one time" been accused of being a fugitive from a charge involving use of a weapon (*id.* at 949). Despite these facts, the court ruled, *Quarles* permitted the officers to interrogate Williams because they "could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time, [or] whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way." *Id.* at 953–54.

Other courts of appeals, however, have taken a narrower view of *Quarles.* In *United States v. Raborn,* 872 F.2d 589, 595 (5th Cir.1989), in a decision difficult to square with such cases as *Edwards* and *Shea,* the Court ruled that *Quarles* did not justify unwarned interrogation of a narcotics suspect, where the gun the police suspected was believed to be in a truck that the officers had already secured. But the issue there was not the admissibility of any statement, but of the gun itself, which the court held was subject to seizure on other grounds. In *United States v. Mobley,* 40 F.3d 688, 690–94 (4th Cir.1994), a case very similar to *Williams,* agents executing arrest and search warrants asked Mobley,

after his arrest but before warnings were administered, whether "there was anything in the apartment that could be of danger to the agents who would be staying to conduct the search warrant, such as a weapon." Emphasizing that *Quarles* states "an *exception* to the *Miranda* rule," the court cautioned against applying it in "an ordinary and routine arrest scenario." *Id.* at 693 (emphasis in original). Noting that the apartment had already been secured, that Mobley was the only person present, and that no one else lived there, the court held that there was "no demonstration of an 'immediate need' that would validate protection under the *Quarles* exception." *Id.*

### D. *Applications of Quarles in this District*

Finally, in all but one of the reported decisions from this district concerning the public safety exception, judges have found *Quarles* applicable and denied suppression motions. *See, e.g., United States v. Soto,* No. 99 Cr. 1246(LMM), 2000 WL 1738663, at *1–2 (S.D.N.Y. Nov. 22, 2000) (finding statements about firearms and ammunition to be admissible because of, among other things, police safety concerns and the presence of "other individuals nearby, and Perez's young children who were coming home from school imminently"); *Bramble v. Smith,* No. 96 Civ. 5905(JFK), 1998 WL 395265, at *14 (S.D.N.Y. July 15, 1998) (denying habeas claim where incriminating statement about the location of a murder weapon was elicited to protect officers who were interrogating suspect in his apartment); *United States v. Alfonso,* No. 94 Cr. 813(HB), 1995 WL 6225, at *3 (S.D.N.Y. Jan. 9, 1995) (denying motion to suppress statement about whether others were present in an apartment because the "officers had a valid safety concern" in securing the premises of a suspected nar-

cotics dealer); *Howard v. Garvin*, 844 F.Supp. 173, 175 (S.D.N.Y.1994) (finding, in state habeas context, that trial court correctly admitted statement by robbery suspect because of police concerns about other suspects' being commingled with nightclub patrons).

The Court has located only one decision in this district that suppressed statements that the government attempted to introduce pursuant to *Quarles,* and its facts are quite different from those before this Court. In *United States v. Gonzalez,* 864 F.Supp. 375 (S.D.N.Y.1994), an officer on the street noticed that defendants Colon and Gonzalez were carrying firearms. When the officer instructed them to halt, Gonzalez fired a shot at him. After a chase into a driveway area during which the defendants discarded their weapons, the officer eventually caught Colon. When Colon claimed to be a police officer, the officer questioned him to determine the truth of the claim. Judge Leisure agreed that the public safety exception permitted limited questioning of Colon to verify his story, because if the story was true, the officer could pursue Gonzalez instead. He found, however, that the officer's public safety concerns were obviated as soon as he obtained sufficient information to establish that Colon was lying about being a policeman, and suppressed statements made in response to questioning that continued beyond that point. *Id.* at 381–82.

### E. *Quarles Applied to this Case*

Courts, then, have taken somewhat divergent approaches to determining the breadth of the public safety exception announced in *Quarles.* While it is universally recognized that *Quarles* should not be confined to its particular facts, at least some of the cases applying it in relatively routine search and arrest situations stand for this Court more as cautionary tales

than as persuasive precedents. Most persuasive to me is the Fourth Circuit's reasoning in *Mobley.* As the majority opinion in that case recognized, *Quarles* represents an exception that should not be allowed to swallow the rule. There are indeed cases in which the safety of the police themselves or of the general public requires urgent questioning to get answers that should not be inhibited by warning the person questioned that perhaps he would do better not to respond. *Khalil* represents the extreme of that situation: confronted with a bomb that might or might not be about to explode, no rational person could think that the police, before questioning the bomb's maker about its characteristics, must advise the bomber in effect that it behooves him to consult counsel before answering.

On the other hand, the result in *Quarles* rested neither on the true but unspecific notion that guns are dangerous instrumentalities nor on a generalization that certain types of criminals often have them. It rested, rather, on *specific* reliable information that a weapon was present, and a *specific* reason to think that the location of the gun posed a concrete danger to the public. As the Fourth Circuit wrote:

> Absent other information, a suspicion that weapons are present in a particular setting is not enough, as a general matter, to demonstrate an objectively reasonable concern for immediate danger to police or public; each case must be examined on its own facts to determine whether the deviation from the standard rule is justified by the totality of the circumstances in which the questioning takes place.

40 F.3d at 693 n. 2. If this wise counsel is not followed, the result will be something that "approaches a *per se* rule as to questioning people in custody on narcotics charges." *Id.* Such a broad rule would

simply license a category of custodial interrogation that will have little to do with the exigencies of public safety, and much to do with eliciting broadly incriminating statements without the safeguards required by the Constitution.

This Court thus reads *Quarles* as the Supreme Court announced it: as a "narrow exception" to the *Miranda* doctrine, 467 U.S. at 658, 104 S.Ct. 2626, that carves out a circumscribed opportunity for law enforcement officials—in need of immediate information to protect themselves and members of the general public from harm—to conduct limited interrogations of suspects who, if apprised of their right against self-incrimination, might be unwilling to provide that information. Such an exception, however, does not accord officers an automatic right to interrogate suspects simply because it is possible that firearms are present at the arrest scene. In the context of searches for weapons, this doctrine requires, at a minimum, that the authorities have some real basis to believe that weapons are present, and some specific reason to believe that the weapon's undetected presence poses a danger to the police or to the public.

▮ Although the case is a close one, that standard is met here. When the officers entered the apartment, their basis for believing that a weapon was present was slim. The officers had reason to believe, based on conversations with a confidential informant conducted months before the raid, that defendant had been involved with selling firearms in the vicinity several months earlier.[8] There was no indication, however, that the informant had made any purchases in the apartment, and little reason to believe, given the long passage of time, that any weapon might still be in the apartment. That information, however, did give the officers some specific reason, beyond generalizations about drug dealers, to think a gun was present. That information, moreover, was refreshed and solidified when Milione found a box of ammunition in Jones' closet. At that point, at least, before Jones had made any statement, the officers had substantial reason to suspect that a gun might be present.

Moreover, unlike the agent in *Anderson*, who sought to use exigency as "a *post hoc* rationalization for his conduct," but who in fact admitted that he used the same interrogation tactic "*in every case*," 929 F.2d at 100 (emphasis in the original), the officers here had a specific rationale for concluding that finding the gun would avoid a particular danger. Huber testified that neither he nor the NYPD had a general policy of interrogating suspects about guns without *Miranda* warnings when arresting suspects at a location where guns might be present. (Tr. 42–43.) He specifically indicated that he was concerned, and expressed his concern to Jones, that the young child who resided at the apartment might inadvertently come upon any weapon that Jones upon being arrested might leave uncontrolled at the scene. (Tr. 13–14, 41–43.)[9] Whether this concern was sincere or pretextual is irrelevant; what

---

8. The government concedes that Jones' last known involvement in gun dealing involved the unconsummated projected sale of an inoperable 9 mm. pistol in May, 2000, six months before the arrest. (G.Br.4.)

9. Concern for the officers' safety is a less compelling rationale on the specific facts of this case, where the officers had already secured the premises and the occupants, and had no reason to believe that anyone else on the premises was a threat. Given the concern for the danger to the child, it is unnecessary to decide whether on these facts there was an objective basis for concern about the officers' safety.

matters is that there was an objectively reasonable basis for concern that a particularly vulnerable member of the general public could be endangered by the presence of an untended weapon.[10]

Although the Second Circuit has not yet had occasion to consider whether the presence of young children in a residence where officers reasonably believe a firearm might be stored can support application of the public safety exception, several other circuits (and a judge of this district) have so held. *See, e.g., United States v. Soto,* 2000 WL 1738663, at *1–2; *United States v. Simpson,* 974 F.2d 845, 847 (7th Cir. 1992); *United States v. Lawrence,* 952 F.2d 1034 (8th Cir.1992); *United States v. Antwine,* 873 F.2d 1144, 1147 (8th Cir. 1989). And the conclusion is logical: unlike adults, who might be expected to behave rationally if they discover a firearm, a child's interactions with untended weapons are inherently dangerous.

Accordingly, given the officers' objectively reasonable concern for the risk that the young child residing in defendant's apartment might have been in danger if they failed to interrogate defendant about the presence of firearms in the apartment, the *Quarles* public safety exception to the *Miranda* rule justified the unwarned interrogation, strictly limited to the location of the firearm, that was conducted here. Accordingly, defendant's gestures indicating that a firearm was stored in the living room couch are admissible, and his motion to suppress is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motions to suppress the firearm discovered

in his apartment and the statement made about the firearm are denied.

SO ORDERED.

---

**10.** The case is thus distinguishable from *Mobley,* where the defendant was the sole individual present in an apartment in which he resided alone. 40 F.3d at 693.