**UNITED STATES of America,**

v.

**Ramon REYES, Defendant.**

**No. 02 CR. 1195(GEL).**

United States District Court,
S.D. New York.

Feb. 11, 2003.

---

Alexander H. Southwell, Assistant United States Attorney, New York, New York

(Joseph DeMarco, Assistant United States Attorney, James B. Comey, United States Attorney for the Southern District of New York, for United States of America), of counsel.

Joseph A. Grob, Moskowitz & Book, LLP, New York, New York, for Defendant Ramon Reyes.

## OPINION AND ORDER

LYNCH, District Judge.

Defendant Ramon Reyes, who is charged in a three-count indictment with possession of heroin with intent to distribute, carrying a firearm in connection with a narcotics crime, and possession of a firearm by a convicted felon, moves to suppress certain statements made at the time of his arrest.[1] The Court held an evidentiary hearing, and received and considered briefs from the parties. The motion is granted.

## FINDINGS OF FACT

The following facts are based on the testimony provided at the hearing by three New York City detectives, which the Court finds to have been highly credible. The Court sets forth here only those facts necessary for the presentation of the issue addressed in this opinion; additional findings of fact are set forth in the Court's oral opinion.

Reyes was arrested on October 17, 2001, based on probable cause to believe that he was in possession of heroin that he had brought to the place where he was arrested to sell to what turned out to be an undercover police officer. Detective Mark Moran, arriving on the scene in response to a prearranged signal that Reyes had

---

1. Reyes also moves to suppress physical evidence seized at the time of his arrest and another statement made at the police precinct some time later. These motions have been denied in an oral opinion delivered in open court on this date.

come with the drugs and that an arrest was to be made, "pushed" Reyes "face down on the hood of the car" and prepared to search him incident to the arrest. (Tr. 46–47; see also Tr. 9.) According to Moran's testimony, corroborated by that of his partner who observed the interaction, before commencing the search Moran "asked [Reyes] if he had anything on him that can hurt me or anyone on my field team." (Tr. 68.) Moran testified that this is standard police procedure before beginning a frisk or search of a person in a drug case, in order to protect the officer against the possibility of being harmed by sharp objects, such as hypodermic needles or razor blades, that a suspect might have in his pockets. (Tr. 74–75.) Reyes responded that he had a gun in his pocket. Moran then repeated the question, asking if Reyes "had anything inside [his] pocket that could hurt me." (Tr. 68.) Reyes, who does not speak English well, then "made the statement there was drugs inside the car, that was it." *Id.*

It is undisputed that Moran did not advise Reyes of his rights before asking these questions. Reyes moves to suppress his answers, arguing that they were made in response to presumptively coercive custodial interrogation, without the required warnings, in violation of the rule of *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The statements, and in particular the statement about the drugs, are potentially significant in the case, since they would help refute any claim that the drugs had been planted in the car without Reyes's knowledge by the confidential informant who had arranged the supposed heroin sale.

## DISCUSSION

In *Miranda,* the Supreme Court ruled that because custodial interrogation of ar-rested suspects in criminal cases is inherently coercive, statements made in response to such interrogation should be treated as presumptively coerced, and are not admissible against the defendant unless the defendant was advised before interrogation of his rights to remain silent and to the presence of an attorney, including an appointed attorney if he was unable to afford one and of the fact that anything he said could be used against him later. In *Dickerson v. United States,* 530 U.S. 428, 431, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Court reaffirmed that ruling, and made clear that the rule of *Miranda* is of constitutional magnitude.

 Beyond any question, the statements made by Reyes were made in response to custodial interrogation. "A court evaluating whether a person is in custody for *Miranda* purposes must consider 'the circumstances surrounding the interrogation; and . . . given those circumstances would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *United States v. Romaszko,* 253 F.3d 757, 760 (2d Cir.2001), quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Reyes was not free to leave; the officers had descended in response to a signal in order to arrest him, and he was being forcibly pinned to the car. "The act of interrogation encompasses 'express questioning or its functional equivalent' "; words or actions of the police that are " 'reasonably likely to elicit an incriminating response' " are regarded as tantamount to direct questioning. *United States v. Gelzer,* 50 F.3d 1133, 1138 (2d Cir.1995), quoting *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The statements at issue here were direct responses to ex-

press questioning by Detective Moran.[2]

 It would thus appear that *Miranda* requires suppression of the statements at issue. The government argues, however, that the statements are admissible because the questioning at issue falls within an exception to *Miranda* announced in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In *Quarles,* police officers in hot pursuit of a rapist armed with a firearm apprehended the apparent perpetrator, wearing an empty shoulder holster, in a supermarket. An officer handcuffed him and, without giving *Miranda* warnings, "asked [Quarles] where the gun was." *Id.* at 652. Quarles nodded his head toward "some empty cartons" and said, "the gun is over there." *Id.*

Reversing the state courts' suppression of Quarles's statement, a 5–4 majority of the Supreme Court held that *"on these facts,* there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence." *Id.* at 655 (emphasis added). The Court based what it called "a narrow exception to the *Miranda* rule *in this case,"* *id.* at 658 (emphasis added), on the exigencies of the situation facing the arresting officers, including "the immediate necessity of ascertaining the whereabouts of a gun" that Quarles had removed from his holster and tossed aside in a public place where "an accomplice might make use of it" or "a customer or employee might later come upon it." *Id.* at 657. In light of such a potential danger to public safety, the Court held, advising Quarles of his rights might have discouraged him from helping the police to locate the firearm before it could pose a danger to the public at large. *Id.*

Although the *Quarles* Court made reference throughout the opinion to the narrowness of the "public safety" exception and its apparent limitation to the facts of the particular case, other language in the opinion suggests that the Court foresaw a potentially broader application of the new constitutional rule. For example, in clarifying that police officers could not employ the exception as a license to conduct an unfettered testimonial interrogation of a suspect who has not been read his *Miranda* rights, the Court noted that it would be acceptable for officers to ask "questions necessary to secure their own safety or the safety of the public." *Id.* at 658–59. Moreover, the Court predicted that the exception would "free [officers] to follow their legitimate instincts when confronting situations presenting a danger to the public safety." *Id.* at 659. The Court's opinion in *Quarles* thus leaves considerable uncertainty as to whether the Court intended its holding to be confined to the narrow factual circumstances of the case or, instead, to provide law enforcement officials with broader latitude to conduct limited custodial interrogations whenever public safety concerns might be implicated.

Pointing to this language, the government plausibly argues that Detective Moran, like the officers in *Quarles,* was simply asking "questions necessary to secure [his] own safety." Of course, Moran was authorized to (and almost immediately did) perform a search incident to the arrest of Reyes in order to determine whether

---

2. Without directly attempting to apply the rule to the facts of this case, the government correctly notes that "a spontaneous, unprovoked statement of a defendant is fully admissible regardless of whether or not the defendant is in custody." (G. Mem. 9–10), citing

*United States v. Guido,* 704 F.2d 675, 677 (2d Cir.1983). But Reyes's statements, even if not entirely responsive to the precise questions asked, were clearly neither "spontaneous" nor "unprovoked." They were answers to direct questioning by the officer.

Reyes had within reach any weapon that might be used against the arresting officers. *See Chimel v. California* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). But the government contends that before performing such a search, an officer is entitled to ask the arrested person about dangerous objects in his pockets, because an officer searching a defendant might be injured by sharp objects such as knives, syringes, or razor blades kept there. Like the questioning at issue in *Quarles,* it argues, such queries are permissible not in order to elicit incriminating admissions, but simply in order to secure the safety of the officer.

The rule proposed by the government goes well beyond the facts of *Quarles.* There, the Court was concerned that a loaded firearm, carelessly discarded in a public place, posed an emergent threat to the general public, including children. Here, the situation was completely under police control, Reyes had been under observation since his arrival at the location, and any weapon he had with him would be immediately discovered and secured in a police search. Detective Moran testified that "numerous" people carry sharp objects in their pockets, and that he had stopped "a lot" of people who had uncapped hypodermic needles in their pockets (Tr. 69), but nothing in the record permits the Court to quantify this problem, and absolutely nothing of what was known about Reyes gave any particular reason to believe that his pockets in particular might have been booby-trapped. While the government's argument fits within the broader dicta in *Quarles,* it would be hard to consider the rule proposed a "narrow exception" that would apply only in situations marked by particular facts. Rather, what the government appears to propose is that *whenever* officers arrest *anyone,* they are entitled to ask, before advising the defendant of his rights, what the person has about his person that might be "dangerous" or "harmful" to the officers and to use whatever he says in a subsequent prosecution.

In *United States v. Jones,* 154 F.Supp.2d 617, 625–30 (S.D.N.Y.2001), this Court surveyed the case law applying *Quarles* within and without this Circuit. There is no need to repeat that survey here. The Court's conclusion was that while there was no controlling decision in this Circuit, there appeared to be a conflict in other circuits between decisions applying *Quarles* broadly to admit unwarned statements on facts quite similar to those of the present case,[3] and decisions reading *Quarles* more narrowly and suppressing similar statements on the ground that there was no public safety threat.[4] After

---

**3.** *See, e.g., United States v. Shea,* 150 F.3d 44, 47–48 (1st Cir.1998) (bank robbery suspect asked whether he had weapons or needles after being arrested and in anticipation of search incident to arrest); *United States v. Edwards,* 885 F.2d 377, 384 & n. 4 (7th Cir. 1989) (because "drug dealers are known to arm themselves," the officers had an "objectively reasonable need" to protect themselves "from the immediate danger that a weapon would pose," even though defendants had already been handcuffed and frisked); *United States v. Williams,* 181 F.3d 945, 953 (8th Cir.1999) (narcotics defendant arrested in his apartment, which was about to be searched pursuant to a warrant, asked by police "is there anything we need to be aware of?").

**4.** *See, e.g., United States v. Mobley,* 40 F.3d 688, 690–94 (4th Cir.1994) (agents executing arrest and search warrants asked defendant whether "there was anything in the apartment that could be of danger to the agents who would be staying to conduct the search warrant, such as a weapon"); *United States v. Raborn,* 872 F.2d 589, 595 (5th Cir.1989), (*Quarles* did not justify unwarned interrogation of a narcotics suspect, where police suspected presence of a gun in a truck the officers had already secured).

considering these and other cases in detail, the Court agreed with the Fourth Circuit in *Mobley*, 40 F.3d at 693 n. 2, that the *Quarles* exception should be read narrowly, lest a limited exception turn into "a *per se* rule as to questioning people in custody on narcotics charges":

> This Court thus reads *Quarles* as the Supreme Court announced it: as a "narrow exception" to the *Miranda* doctrine, 467 U.S. at 658, 104 S.Ct. 2626, that carves out a circumscribed opportunity for law enforcement officials—in need of immediate information to protect themselves and members of the general public from harm—to conduct limited interrogations of suspects who, if apprised of their right against self-incrimination, might be unwilling to provide that information. Such an exception, however, does not accord officers an automatic right to interrogate suspects simply because it is possible that firearms are present at the arrest scene. In the context of searches for weapons, this doctrine requires, at a minimum, that the authorities have some real basis to believe that weapons are present, and some specific reason to believe that the weapon's undetected presence poses a danger to the police or to the public.

154 F.Supp.2d at 629.[5]

A similar standard must apply here. Unless every suspect in police custody can be interrogated, without *Miranda* warnings, about what the police might find in a search incident to arrest, the public safety exception can only be applied if the officers have some genuine, particularized reason to believe that conducting the search will be dangerous because of the possible presence of objects whose "undetected presence poses a danger to the police." Then was no such reason here. Moreover, even to the extent that the generalized fear of sharp objects might justify a limited inquiry as to the presence of such objects, that would not render admissible statements made in response to a question as broad as whether "he had anything on him that can hurt me or anyone on my field team" (Tr. 68), a question that can reasonably be expected to lead to information about such matters as weapons in addition to or instead of the information about sharp objects that is the ostensible object of the inquiry. Accordingly, the *Quarles* exception is not applicable.[6]

It should be noted that this conclusion implies no criticism of the officer's conduct. There is nothing terrible about the questions asked by Detective Moran. But there is nothing terrible about most questioning that takes place without *Miranda* warnings. The purpose of the warnings is to ensure that defendants are not led to waive their rights and respond to police

---

**5.** The government calls to the Court's attention only two cases not discussed in *Jones*, both decided by district courts in this Circuit. Neither affects the analysis adopted in *Jones*. In *United States v. Dodge*, 852 F.Supp. 139, 143 (D.Conn.1994), the court applied *Quarles*, but in that case the question asked was "where's the bomb?" Like the Second Circuit's decision in *United States v. Khalil*, 214 F.3d 111 (2d Cir.2000), the public safety rationale was dramatic and obvious, and the case thus quite distinguishable from the instant matter. In *United States v. Ford*, Dkt. No. 96 Cr. 672(LBS), 1997 WL 538813, at **9–10 (S.D.N.Y. 1997), the court suppressed a statement on facts very similar to those here. However, the court there did not cite *Quarles* or address its applicability to the circumstances presented. The case is thus of limited precedential significance.

**6.** In *Jones*, where the officers questioned the suspect about a weapon they had reason to believe was present in the apartment where the defendant had been arrested, and where a small child among others were living, the Court found a threat to public safety, applied *Quarles*, and denied a motion to suppress the defendant's statement. 154 F.Supp.2d at 629–30.

interrogation in an atmosphere that is intrinsically coercive, even when the police have not behaved in a manner calculated to oppress. If ordinary stationhouse interrogation is inherently coercive, the questioning here, however legitimately intended to protect the officer, surely is far more likely to overbear the will of the most strong-willed defendant: not merely "in custody" but physically overpowered, forcibly bent over a car, and urgently (and repeatedly) asked what harmful objects he has on him, any reasonable person would feel compelled to answer. This particular defendant, with a limited command of English, quite naturally did not interpret the question as limited to sharp objects, and confessed to having a gun in his pocket; pressed yet again to provide more information about dangerous objects, he admitted to having drugs in the car. Such statements cannot, in the totality of the circumstances, be considered voluntary, nor can their admission into evidence be squared with the rule of *Miranda.*

Accordingly, the motion to suppress defendant's statements made at the scene of his arrest is granted.

SO ORDERED.