UNITED STATES of America,

v.

Kenneth FERGUSON, Defendant.

No. 00 CR. 675(DC).

United States District Court,
S.D. New York.

Feb. 13, 2001.

Mary Jo White, By Christopher J. Morvillo, Esq., Matthew Biben, Assistant United States Attorneys, New York, United States Attorney for Southern District of New York.

Frankel Rudder & Lowery, LLP, By Stephen K. Frankel, New York City, for Defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

On the night of April 5, 2000, defendant Kenneth Ferguson was driving his car in a high-crime area of the Bronx when he was stopped by four police officers in an unmarked car. The officers removed him from the car, searched him, and recovered a semi-automatic pistol as well as drug paraphernalia. Ferguson, who has previously been convicted of a felony, was thereafter indicted in this case for unlawful possession of a weapon.

Ferguson moves to suppress the gun and other physical evidence. An evidentiary hearing was held on January 4, 2001. For the reasons that follow, the motion is granted.

The following constitute my findings of fact and conclusions of law.

## THE FACTS

### A. The Stop and Search

On April 5, 2000, at approximately 9 p.m., Ferguson, a 33–year old African–American man, was driving his black 1996 Nissan Maxima, license plate number BX592B, in the vicinity of Bush Street and Creston Avenue in a high-crime area of the Bronx. He was accompanied by one passenger, another African–American male, who was sitting in the front passenger seat. Ferguson was driving in a lawful manner. He was not speeding, nor was he driving erratically or in a suspicious manner. His car insurance and registration were in good order. The car had tinted windows.[1]

Four police officers, Detectives Glemaud, Anderson, and Jaime and Sergeant Garcia, noticed Ferguson's vehicle.[2] Three were in plain clothes and one was in uniform; all four were members of the New York Police Department's Street Crimes Unit. After following briefly, they turned on a flashing red light, stopped Ferguson's vehicle, and pulled in behind it, at an angle. Detective Glemaud approached Ferguson's vehicle on the passenger side, and Detective Anderson approached on the driver's side.

Glemaud gave Anderson a signal and, as a result, Anderson asked Ferguson to step out of the vehicle. Ferguson did so, as did the passenger. Both were hand-cuffed, placed under arrest, and searched. The detectives recovered a glass crack pipe and a .380 caliber semi-automatic pistol from Ferguson. The detectives also recovered (either from Ferguson or from inside the vehicle) a 4½ by ⅛ inch metal "stem," or "spoon," a tool used in the smoking of crack. The passenger was later released, but Ferguson was detained and charged with possession of the gun.

The Property Clerk's Invoice described the glass pipe as "glass stem w/ residue," but described the metal stem only as "metal pipe," without noting any visible residue. (GX 4). The laboratory analysis report noted the presence of less than 1.0 grain of cocaine on both the glass pipe and the metal stem.

### B. The Conflicts in the Evidence

The police officers and the Government have offered six at least partially conflicting versions or theories of what transpired on the night in question.

#### 1. The Criminal Court Complaint

The day after the arrest, Detective Anderson swore to a complaint that was filed with the Criminal Court in the Bronx. In the complaint, Anderson stated, under oath, that he was informed by Detective Glemaud that Glemaud:

> observed defendant alone inside a 1996 Nissan Maxima (N.Y. LIC BX592B) sitting in the driver's seat of said vehicle, in custody and control of a glass pipe containing white, rock-like residue in that it was on the middle console by the front seat of said vehicle.

(DX 1).

#### 2. The Complaint in this Case

A special agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF") filed a

---

1. The parties disagree as to whether the windows were legally or illegally tinted. In his affidavits in support of his motion, Ferguson alleges that the car windows were legally tinted and that they were factory installed. (Ferguson Aff., ¶ 7; Frankel Aff., ¶¶ 10, 55). At oral argument, he advised the Court (through his attorney) that he no longer owned the car. The Government presented the testimony of two detectives to the effect that the windows were illegally and excessively tinted. Neither side offered any photographs or documentary proof on the issue. In the end, for the reasons set forth below, I conclude that the Government has not met its burden of proving that the windows were illegally tinted.

2. Glemaud and Anderson are African–American; Jaime and Garcia are Hispanic.

complaint in this case, based largely on his conversations with two police officers. The complaint alleges, in substance, as follows:

On April 5, 2000, the officers observed Ferguson's vehicle with what "appeared to be illegally tinted windows." They began to follow the car and one of the officers "used the car radio to call in the license plates," and learned that "the license plates were supposed to be surrendered to the Department of Motor Vehicles."

As a result of both the tinted windows and the status of the license plates, the officers decided to pull the car over. They saw two persons in the car. One officer noticed a "crack pipe on the center console." The driver and the passenger were removed from the car and one of the officers discovered the gun on the driver. The other officer "recovered the crack pipe from the car."

### 3. *Glemaud's Testimony*

Glemaud testified at the suppression hearing, in substance, as follows:

The officers pulled Ferguson over because of the excessively tinted windows only; the results of a computer search of the plates did not become known until after the car had been stopped. (Tr. at 14, 77–78, 90–91; *but see id.* at 81, 82). Glemaud initiated the stop, and although he had been involved in other stops of cars for illegally tinted windows, this was the first time he had initiated such a stop. (*Id.* at 85). The officers did not use their car radio and instead checked the plates on a computer located in their vehicle. At some point, the officers learned that the "plates were surrendered." (*Id.*). Glemaud approached on the passenger side, and as he did so, the front passenger window came down. (*Id.* at 15). He then

noticed in the middle console a metal rod, chaff-like object with a metal groove, with a groove in the middle of it that contained a white powdery residue. (*Id.* at 16). He recognized the metal object as a "spoon" or "stem" used to insert crack cocaine into a tube or pipe for smoking. (*Id.* at 20).

Because he saw the metal rod, Glemaud decided to arrest the occupants of the car. He sent Anderson a signal, and Anderson removed the driver from the car and placed him under arrest. At the same time, Glemaud removed the passenger, escorted him to the rear of the vehicle, and hand-cuffed him. (*Id.* at 21). He frisked the passenger and then frisked Ferguson. He removed a "glass stem" (of a type used for smoking crack) from Ferguson's front pants pocket. (*Id.* at 22). Anderson removed the gun from Ferguson's rear pants pocket. (*Id.* at 25, 27). Glemaud told Anderson where the metal rod was located and Anderson recovered it. (*Id.* at 23).

### 4. *Anderson's Testimony*

Anderson testified at the suppression hearing, in substance, as follows:

On April 5, 2000, while the officers were riding in their unmarked car, Glemaud pointed out a car with "tinted windows" that appeared to be tinted excessively. (*Id.* at 45, 46). The plates were "run" on the computer in their car and the search "came back surrendered." (*Id.* at 46–47). Only then did the officers pull the car over. (*Id.* at 47).

Anderson approached on the driver's side and asked the driver for his license, registration, and insurance card. Ferguson gave them to him. As he started looking at the paperwork, Glemaud gave him a signal to arrest the driver. (*Id.* at 47–49). Anderson told Ferguson to step out and when Ferguson did so, Anderson asked him if he had anything that he was "not supposed to have." Ferguson responded that "[i]t's in the car." (*Id.* at 50). Anderson handcuffed Ferguson and directed him to go to the back of the vehicle. Anderson then "began to search the front part of the vehicle" and "[a]t that time, [he] didn't find anything." (*Id.*). Anderson then searched Ferguson and re-

covered the gun. He also observed Gle-maud remove a glass pipe from Ferguson's front pants pocket. (*Id.* at 52).

Anderson testified that "the metal rod was taken from the vehicle," but he did not say by whom. He was not asked who had recovered the metal rod or when it was recovered.

### 5. *The Government's Theory at the Hearing*

At the hearing, the Government offered and I received into evidence Government's Exhibit 1, a printout from the Department of Motor Vehicles showing the results of a search on Ferguson's license plate, BX592B. The report shows no irregularities with the registration or insurance, but reports that Ferguson's old plates (AB651X) were voluntarily surrendered on October 22, 1999. (*See* Tr. at 37). The Government theorized at the hearing that a computer search on April 5, 2000, of plate number BX592B would have shown that the old plates were surrendered. (*Id.* at 39). The Government suggested that the officers ran the plate on April 5, 2000, saw the reference to "VOLUNTARY PLATE SURRENDER," and assumed (mistakenly but in good faith) that the reference applied to the current plates.

### 6. *The Government's Post–Hearing Theory*

At the conclusion of the suppression hearing, the parties agreed to leave the record open so that the Government could follow up on the issue of what a computer search of plate number BX592B on April 5, 2000, would have shown. The parties thereafter entered into a stipulation that NYPD computer records show, in substance, the following:

On April 5, 2000, the officers ran a query on plate BX825B on the computer in their car at 8:53:53 p.m. The response to the query at 8:54:00 p.m. showed that plate BX825B was registered to a 1989 black two-door Honda owned by one Chanwattee

Chaltu and that these plates had been voluntarily surrendered.

At 8:58:01 p.m., four minutes later, the officers ran a query on plate BX592B. The response at 8:58:06 p.m. showed that plate BX592B was registered to a 1996 black four-door Nissan in the name of Kenneth Ferguson and that the plates were valid.

In its post-hearing letter brief, the Government theorizes that the officers mistakenly ran the wrong plate number, BX825B, at 8:53:53 p.m., saw the response that the plates had been surrendered, mistakenly believed in good faith that Ferguson's plates should have been surrendered, and therefore decided to stop the car. The Government further theorizes that after Ferguson's car was stopped, one of the officers ran the correct plate number, but by then Glemaud and Anderson were already arresting Ferguson and his passenger. (Letter from the Government of January 11, 2001, at 3).

### DISCUSSION

### A. *Applicable Law*

#### 1. *The Fourth Amendment*

 The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The stop of an automobile, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Accordingly, "such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994) (internal quotations and citations omitted); *see also United States v. Muyet,* 946 F.Supp. 302, 305 (S.D.N.Y.1996). Where the stop leads to an arrest, a two-step inquiry is required: whether the stop is

supported by "reasonable suspicion," and, if so, whether the arrest is supported by probable cause. *See United States v. Perea*, 986 F.2d 633, 644 (2d Cir.1993) ("an encounter that began as a permissible *Terry* stop may have ripened into an arrest, which must be supported by probable cause"). Of course, in some cases the initial stop and the subsequent arrest may be based on the same set of circumstances.

■ Police officers may make a "brief, investigatory stop" when they have a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Although "reasonable suspicion" is a "less demanding standard" than probable cause, "at least a minimal level of objective justification" is required, and the officers "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"'" of criminal activity." *Id.* at 123–24, 120 S.Ct. 673 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Whether police officers had a reasonable suspicion that criminal activity was afoot is determined by examining the "totality of the circumstances." *Diamondstone v. Macaluso*, 148 F.3d 113, 124 (2d Cir.1998).

■ "Probable cause arises when the police reasonably believe that an offense has been or is being committed." *Scopo*, 19 F.3d at 781 (internal quotations and citations omitted). Probable cause and reasonable suspicion to stop and arrest a driver of a vehicle exist "[w]hen an officer observes a traffic offense—however minor." *Id.* at 782 (internal quotations and citations omitted). Thus, courts have found that a violation of New York's Vehicle and Traffic Law prohibiting the operation of vehicles with excessively tinted windows provides the police with probable cause or reasonable suspicion to stop a car. *See Woods v. Candela*, 921 F.Supp. 1140, 1144–45 (S.D.N.Y.1996) (finding that defendant was properly stopped for excessively tinted windows, in violation of New York law); *United States v. Barber*, 839 F.Supp. 193, 200 (W.D.N.Y.1993) (finding that excessively tinted windows provides "probable cause to believe that a traffic violation was occurring, and to justify [the police] in stopping the car"). In addition, under New York law, police officers may arrest a person for a traffic violation committed in the officers' presence. *See Scopo*, 19 F.3d at 778.

■ The Supreme Court has held that the subjective intent of the police in stopping a vehicle is not a factor when determining whether probable cause existed. *See Whren*, 517 U.S. at 813, 116 S.Ct. 1769. Thus, the "actual motivations of the individual officers involved" in the stop "play no role in ordinary, probable cause Fourth Amendment analysis." *Id.* Judge Newman has cautioned, however, that, although courts have upheld the validity of "so-called 'pretext' arrest[s]," "we should not be understood to be giving police officers carte blanche to skew their law enforcement activity against any group that displeases them." *Scopo*, 19 F.3d at 785 (Newman, J., concurring).

## 2. *The Burden of Proof*

■ A defendant seeking to suppress evidence recovered in a warrantless search must demonstrate that, as an initial matter, he had a reasonable expectation of privacy in the place searched. *See Muyet*, 946 F.Supp. at 309. A driver in lawful possession of a vehicle has such a reasonable expectation of privacy. *See id.* (citing *United States v. Ochs*, 595 F.2d 1247, 1253 (2d Cir.1979)).

■ If this initial burden is met, the burden then shifts to the Government to demonstrate that the search was within one of the exceptions to the requirement of a warrant. *Perea*, 986 F.2d at 639. One such exception is a search incident to an arrest. *Muyet*, 946 F.Supp. at 309. If the arrest follows an investigatory stop, the Government bears the burden of demonstrating both that there was reasonable suspicion for the stop and probable cause

for the arrest. *Perea,* 986 F.2d at 644–45; *United States v. Pena,* 961 F.2d 333, 338–39 (2d Cir.1992); *United States v. Gutierrez,* No. 99 Cr. 209(WHP), 1999 WL 550213, at *3 (S.D.N.Y. July 28, 1999); *United States v. Campbell,* 959 F.Supp. 606, 613 (W.D.N.Y.1997).

## B. *Application*

The Government contends that the police officers had reasonable suspicion for stopping the car because the officers believed that the windows of Ferguson's car were excessively tinted, and the officers believed, mistakenly but in good faith, that a computer search showed that his plates should have been surrendered. In addition, the Government argues that once the officers stopped Ferguson's vehicle, they had probable cause to arrest him because Glemaud spotted the metal stem in the middle console.

Ferguson argues that Glemaud's testimony should be rejected as incredible, and he contends that the four police officers—members of the NYPD Street Crimes Unit—stopped him without reasonable suspicion or probable cause. Indeed, he alleges that the officers engaged in unlawful "racial profiling."

The motion to suppress is granted, because I conclude that the Government has not met its burden of proving, by a preponderance of the evidence, that the four police officers had reasonable suspicion to stop the car or probable cause to arrest Ferguson.

The evidence presented by the Government and the police officers is replete with inconsistencies and contradictions. The Criminal Court complaint, for example, makes no mention of tinted windows or a license plate search. More significantly, it alleges that the defendant was "alone" in his car when clearly he was not, and it alleges that the "glass pipe" was seen in the middle console of the car when the detectives testified that the "glass pipe" was seized from the defendant's pants pocket after he was told to exit the vehicle.

In addition, Glemaud testified that he saw a "metal stem" in the center console, but the ATF complaint does not mention the metal stem at all and instead alleges that the "crack pipe" was seen in the center console. The ATF complaint does not allege that a crack pipe or any other drug paraphernalia was removed from defendant, but states that the "crack pipe" was recovered from the car. In addition, the ATF complaint alleges that the officers "used the car radio to call in" the license plate of defendant's car, when it is clear that the officers did not make any radio transmissions but instead used the portable computer in the car to search the Department of Motor Vehicle records.

The detectives' testimony at the suppression hearing raises significant questions in other respects as well. At one point Glemaud testified that the sole basis for stopping the car was the tinted windows, as he stated that the license plate search was not conducted until after the car was stopped. (*See* Tr. at 14, 77–78, 90–91). On the other hand, Anderson testified that the car was stopped for two reasons—the tinted windows *and* the results of the license plate search. (*See, e.g., id.* at 46–47). In addition, Glemaud testified that Anderson removed the metal stem from the car, but Anderson testified that after he asked the defendant to get out of the car, he searched the front part of the car and found nothing. If the metal stem had been in the middle console in plain view, presumably Anderson would have seen and recovered it when. he conducted his search. If the metal stem was not actually in the middle console, then Glemaud had no articulable basis for believing, prior to searching him, that Ferguson had committed a crime for which he should be arrested. Again, neither the Criminal Court complaint nor the ATF agent's complaint makes any mention of a metal stem. Moreover, it is surprising that Ferguson would have left the metal stem in plain view, knowing that police officers were approaching, and it is also

surprising that Glemaud would have been able to see the 4½ by ⅛ inch metal stem, "contain[ing] [less than 1.0 grain of] a white powdery residue," from five feet away at night and recognize it as drug paraphernalia. (*See* Tr. at 16, 19; *cf.* DX 1 (Criminal Court complaint alleging that Glemaud "observed" a "glass *pipe* containing white, *rock*-like residue" in the middle console) (emphasis added); *see also* GX 4 (describing "glass stem w/ residue" and "metal pipe," each containing less than 1.0 grain of cocaine)).

There is also an apparent inconsistency in the testimony of the two detectives with respect to timing. Glemaud testified that he saw the metal stem as he approached the front passenger door, as the window was in the process of being lowered. (Tr. at 15–16). According to his testimony, he sent the signal to his partner right away to make the arrest. Anderson, on the other hand, testified that he asked Ferguson for his paperwork, Ferguson produced it, and Anderson was in the process of reviewing it when Glemaud sent him the signal. (*Id.* at 47–49). Presumably, it would have taken Ferguson a moment to locate his license, registration, and insurance information and hand them to Anderson and it would have taken another moment for Anderson to start reviewing the paperwork. In addition, Glemaud testified that he did not remember anyone asking Ferguson for his paperwork and that he did not think Ferguson handed the documents to anyone; he even speculated that perhaps Ferguson did so at the precinct. (*Id.* at 89).

At the hearing, the Government also theorized that the officers made a computer check of Ferguson's plate on April 5, 2000, and mistakenly believed, when they saw a reference to Ferguson's old plates being surrendered, that there was a problem with the existing plates. Information uncovered after the hearing, however, showed that this theory was incorrect. The Government's second theory, based on the additional information obtained after the hearing, is that the officers initially ran the wrong plate number, saw that those plates should have been surrendered, and mistakenly believed that Ferguson's plates should have been surrendered. The officers then realized, according to the Government's second theory, that the wrong plate had been searched and they therefore ran a second search, of the correct plate number, a few minutes later. The problem, of course, is that neither of the two detectives testified at the suppression hearing that two computer searches were done, and no one testified that the wrong plate number had been initially run.

The Government acknowledges that the police officers and ATF agent made mistakes in their respective sworn complaints, but argues that the mistakes were innocent ones attributable to, at worst, sloppiness. The errors and inconsistencies, however, are not just found in the complaints. Rather, the errors and inconsistencies appear throughout the evidence, and the mistakes and contradictions are not just minor ones. They exist with respect to important facts, such as how many individuals were in the vehicle, whether a metal stem or a glass pipe or any contraband was seen in the center console, and whether and when the officers made a radio transmission or computer search.

In the end, the police officers' instincts were correct, as Ferguson, a convicted felon, was indeed in possession of an illegal weapon. But those instincts were based not on any articulable, objective facts suggestive of unlawful conduct, but on, at best, an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In view of the errors and inconsistencies in the record, I am not persuaded that the officers stopped Ferguson because of excessively tinted windows, I am not persuaded that the windows were illegally tinted (or that they even seemed to be so), and I am not persuaded that the officers saw a metal crack stem in plain view in the center

console of the car. Rather, I believe this was nothing other than a random stop.[3] Accordingly, the gun and other physical evidence will be suppressed. *See United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir.1980) ("[I]nvestigatory stops cannot be made completely at random ... or at the 'unfettered discretion of officers in the field.'") (citations omitted).

## CONCLUSION

Defendant's motion to suppress the gun and other physical evidence is granted. A pretrial conference will be held on March 7, 2001, at 2:00 p.m. The time until then is excluded for speedy trial purposes in the interest of justice.

SO ORDERED.

---

**3.** Significantly, in the decisions upholding pretextual traffic stops, the police officers used a perceived traffic violation to stop a vehicle because of actual concerns or suspicions of other criminal conduct. *See, e.g., United States v. Dhinsa,* 171 F.3d 721, 723 (2d Cir.1998) (stopping defendant after observing a traffic violation because the police suspected him of threatening to kill a person); *Scopo,* 19 F.3d at 779 (stopping defendant after observing a traffic violation because the police had identified him as a member of the Colombo crime family); *Woods,* 921 F.Supp. at 1142 (stopping defendant after observing a traffic violation because the police had received a description of a car involved in several robberies that matched defendant's car). Here, there were no such actual concerns, reasonable or otherwise. Ferguson was not speeding or driving erratically or engaging in any conduct that should have given rise to any suggestion of criminal conduct.