**UNITED STATES of America,**

**v.**

**Luis GARCIA, Defendant.**

**No. 03 CR. 195(WHP).**

United States District Court,
S.D. New York.

Aug. 27, 2003.

Daniel W. Levy, David Raskin, Assistant United States Attorneys, New York City, for U.S.

Leonard F. Joy, Federal Defender Division, New York City, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

On or about February 13, 2003, defendant Luis Garcia ("Garcia") was charged in a three-count indictment (the "Indictment") with: (1) possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1); (2) possession of a controlled substance, specifically, 475 tablets of ecstasy, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(C); and (3) possession of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Currently before this Court is Garcia's motion pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure to suppress: (1) evidence obtained by law enforcement authorities in a search following a traffic stop; (2) an oral statement made by Garcia during his arrest; and (3) a written statement allegedly made by Garcia while in custody.

(Motion to Suppress, dated April 9, 2003 ("Suppression Motion") at 1.) For the reasons set forth below, defendant's motion is denied.

## BACKGROUND

On June 18, 2003, this Court held a suppression hearing during which it heard testimony from three prosecution witnesses, namely New York Police Department ("NYPD") officers Russell Argila ("Officer Argila"), Sean Fogarty ("Officer Fogarty") and Kevin McCarthy ("Officer McCarthy"), and three defense witnesses, namely Assistant Bronx County District Attorney Lauren Coyne ("ADA Coyne"), the defendant's wife, Wandy Charbonier ("Charbonier"), and Hiram Montalvo ("Montalvo"), an auto mechanic. The defendant did not testify. Further, this Court heard closing presentations from the parties on July 29, 2003. After evaluating the demeanor and credibility of the witnesses called by each side, and evaluating the exhibits, the Court makes the following findings of fact.

On the evening of January 12, 2003, Officers Argila, Fogarty and McCarthy, all of the NYPD's Bronx Anti–Crime ·Unit, were patrolling the Featherbed McCombs area of the Bronx in an unmarked police car driven by Officer Argila. (Transcript of Suppression Hearing, dated June 18, 2003 ("Tr.") at 5–7.) At approximately 10:30 p.m., Officer Argila noticed, and began following, a green sedan with what appeared to be excessively tinted side windows proceeding northbound on University Avenue. (Tr. at 8–9, 11, 106, 127; Government Exhibit ("GX") 1.)

The officers pulled up alongside the green sedan as it was stopped to make a left-hand turn off University Avenue onto 174th Street, and motioned for the driver to proceed with his turn. (Tr. at 12, 14, 42, 58.) As the green sedan made the turn onto 174th Street, Officers Argila and Fogarty noticed that its rear, high-mounted brake light was not working. (Tr. at 16, 42–43, 65, 86–87; GX 1.) The officers followed the green sedan as it proceeded on 174th Street for one block ·and made a right turn onto Montgomery Avenue, at which point the officers pulled it over. (Tr. at 17–19, 42–43, 87; GX 1.)

All three officers exited their vehicle and approached the green sedan from different sides. Officer Argila approached the driver's door, Officer Fogarty approached the passenger's door, and Officer McCarthy waited by the rear of the car. (Tr. at 18, 87, 127.) The driver's window was open, and Officer Argila spoke with the driver, Christopher Felix ("Felix"), through the. open window. (Tr. at 19.) Felix told Officer Argila that the car belonged to Garcia. (Tr. at 20.)

While Officer Argila was speaking with Felix, Officer Fogarty approached the passenger's door and attempted to look into the passenger compartment. (Tr. at 88–89.) Officer Fogarty could not see in, however, because the window, which was heavily tinted,· was only slightly open. As a result, Officer Fogarty opened the passenger's door. (Tr. at 21, 88–89.) As he opened the door, Officer Fogarty observed Garcia, who was sitting in the passenger's seat, lean towards the middle of the car and "nudge[ ] his elbow down over his waist" in what Officer Fogarty perceived to be an attempt to cover a "bulge" in his waist area. (Tr. at 89.)

Officer Fogarty ordered Garcia to step out of the car, and in doing so grabbed his arm to expedite the process. (Tr. at 21, 91.) Once Garcia exited the vehicle, Officer Fogarty patted him down. Officer Fogarty felt the butt of a gun in Garcia's waistband, and immediately handcuffed him while calling out "hot lunch," a pre-arranged signal indicting the presence of a

firearm to the other officers. (Tr. at 22, 91–92.) After Garcia was handcuffed, and as Officer Argila began a search of the car, Officer Fogarty asked Garcia "is there anything else you want to tell us about," to which Garcia replied that he had ecstasy pills secreted in his groin area. (Tr. at 93, 102.) Neither Officer Fogarty nor any other officer attempted to recover the pills at that time.

Officer McCarthy drove the green sedan to the 46th Precinct, while Officers Argila and Fogarty followed in their unmarked police car with Felix and Garcia. (Tr. at 24, 94.) When they arrived at the Precinct, Officers McCarthy and Fogarty searched Garcia and recovered 475 tablets of ecstasy from Garcia's groin area. (Tr. 25–26, 67; GX 6.) He was then placed in a holding cell.

Later that same evening, Officer Argila removed Garcia from the holding cell and brought him to the arrest processing room for questioning. (Tr. at 27–28.) Officer Argila had with him a one-page form that he prepared, containing a photocopy of the *Miranda* warnings at the top and a blank space underneath. (Tr. at 27, 66–67; GX 2.) Officer Argila then read Garcia his rights, pausing after each statement to ask whether Garcia understood. (Tr. at 32–33.) Each time, Garcia answered in the affirmative, which Officer Argila noted by writing "yes" and his initials next to the corresponding line on the form. (Tr. at 32–33, 69–71; GX 2.) Officer McCarthy was present in the processing room when Officer Argila began to read Garcia his *Miranda* rights, and Officer Fogarty arrived sometime toward the middle of the presentation. (Tr. at 33–34, 98, 113, 128–29.)

After being advised of his *Miranda* rights, Garcia agreed to answer questions. (Tr. at 27–34; GX 2.) Officer Argila asked Garcia questions and Garcia answered, in the form of a conversation. (Tr. at 35–37, 71.) During the interview, Garcia admitted, *inter alia*, that: (1) the windows on the car were in fact tinted, and that he had paid to get it done; (2) while following the green sedan on the trip to the 46th Precinct, he noticed that the rear brake light was out; (3) he purchased the gun he was carrying for $200, and that he carried it because he was going to pick up ecstasy from a location in the Bronx; and (4) he was picking up the ecstasy for an unidentified woman. (Tr. at 35–38; GX 2.) Officer Argila recorded the sum and substance of Garcia's statements on the form. (Tr. at 34, 118; GX 2.) When the interview was completed, Officer Argila drew a line across the remaining blank portion of the form, signed it and dated it, and asked Garcia to review it and sign it if it was true. (Tr. at 39; GX 2.) Garcia reviewed the form, and signed it. (Tr. at 34–35, 39, 99, 116; GX 2.)

On January 13, 2003, Officer Fogarty and Assistant Bronx County District Attorney Lauren Coyne ("ADA Coyne") sat together to prepare a criminal complaint. (Tr. at 101, 119.) As a result of that session, ADA Coyne marked on the criminal case file jacket that Garcia did not make a statement to the officers, and that he had requested a lawyer. (Defendant's Exhibit ("DX") A; Tr. at 120–21.) At the suppression hearing, Officer Fogarty did not recall discussing Garcia's statement with ADA Coyne, and testified that he never told her that Garcia had asked for a lawyer. (Tr. at 101–02, 119, 121.) During her testimony at the suppression hearing, however, ADA Coyne had no present recollection of the relevant portions of her meeting with Officer Fogarty, but surmised based on her practice and the notations on the file that Officer Fogarty told her that Garcia had not made a statement

and had asked for a lawyer. (Tr. at 141–42.)

At the suppression hearing, Charbonier testified that after Felix returned the green sedan to her the next morning, she brought it to Montalvo to have the brake light checked. (Tr. at 150–51, 158–59.) Montalvo testified that, when he checked the green sedan on the morning of January 13, 2003, the rear, high-mounted brake light was fully operational. (Tr. at 152, 165–66.) Charbonier also testified that she paid about $200 to have the windows on the green sedan tinted. (Tr. at 155.)

## DISCUSSION

### I. *The Traffic Stop*

■ A traffic stop is a limited seizure within the meaning of the Fourth and Fourteenth Amendments to the United States Constitution. *See Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Harrell,* 268 F.3d 141, 148 (2d Cir.2001); *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994). Therefore, in order to stop a car, the police must have either "probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *Scopo,* 19 F.3d at 781 (citations and internal quotations omitted); *accord Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Evidence seized incident to an unlawful traffic stop "is subject to the fruit of the poisonous tree doctrine, and may be suppressed." *Scopo,* 19 F.3d at 781 (citation and internal quotations omitted).

■ While probable cause or reasonable suspicion is required to effect a traffic stop, the observation by a police officer of even minor traffic violations is sufficient reason to stop a car. *See Scopo,* 19 F.3d at 782–84 ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.") (citations and internal quotations omitted); *accord Harrell,* 268 F.3d at 148–49 (police officers' observation that car had tinted windows and a defective brake light sufficient cause to stop car); *United States v. Dhinsa,* 171 F.3d 721, 725 (2d Cir.1998) (police officers' observation of a failure to signal a lane change sufficient cause to stop car); *United States v. Ferguson,* 130 F.Supp.2d 560, 565 (S.D.N.Y.2001) ("courts have found that a violation of New York's Vehicle and Traffic Law prohibiting the operation of vehicles with excessively tinted windows provides the police with probable cause or reasonable suspicion to stop a car"); *Woods v. Candela,* 921 F.Supp. 1140, 1144–45 (S.D.N.Y.1996) (officer "was authorized to stop [driver] for excessively tinted windows.... As [the officer] witnessed the infraction, under New York law, he was therefore authorized to arrest the" driver). Further, the officer's subjective intent in stopping the car is immaterial, as "an observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." *Dhinsa,* 171 F.3d at 725; *see also Ferguson,* 130 F.Supp.2d at 565 ("The Supreme Court has held that the subjective intent of the police in stopping a vehicle is not a factor when determining whether probable cause existed.") (citing *Whren,* 517 U.S. at 813, 116 S.Ct. 1769); *accord Harrell,* 268 F.3d at 148; *U.S. v. Green,* No. 99 Cr. 309(WHP), 1999 WL 1256239, at *2 (S.D.N.Y. Dec. 22, 1999).

■ Here, there were two independent traffic violations upon which the officers legitimately could have based a traffic stop—the excessively tinted windows and the defective brake light. While the ques-

tion of whether the rear, high-mounted brake light was broken is in dispute (*compare, e.g.,* Tr. at 16 *with* Tr. at 165), the Court need not reach the issue because there is no dispute that the green sedan's windows were tinted (Tr. at 8, 155; GX 2). *See Harrell,* 268 F.3d at 149 n. 3 ("It is unclear from the record whether [the police officer] noticed that the car's brake lights violated the Vehicle & Traffic Law before he stopped the car. Because we find that his observation of the tinted windows justified the stop under *Dhinsa,* we need not reach this issue.").

Driving a car with excessively tinted windows is illegal under New York Law. *See* N.Y. Veh. & Traf. Law § 375(12–a)(b) ("No person shall operate any motor vehicle ... [the] side windows of which on either side forward of or adjacent to the operator's seat are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent."). In this case, all three officers observed that the green sedan had side windows that appeared to be tinted beyond the legal limit, and both Garcia and Charbonier admitted that the windows were tinted. (Tr. at 155; GX 2.)

The fact that Officer Argila never tested the windows with a "tint meter" to determine if they were, in fact, in violation of the law is immaterial, as only an objectively reasonable belief or suspicion of a violation, supported by articulable facts, is required. *See Harrell,* 268 F.3d at 149 (probable cause to stop car existed because "an 'objectively reasonable' police officer would have suspected the windows were tinted in violation of § 375(12 a)(b) of the Vehicle & Traffic Law"); *accord Scopo,* 19 F.3d at 781–82; *see also United States v. Wallace,* 213 F.3d 1216, 1220 (9th Cir.2000) (holding that an officer's misunderstanding of the tinting law was immaterial because the officer "was not taking the bar exam.

The issue is not how well [the officer] understood California's window tinting laws, but whether he had objective, probable cause to believe that these windows were, in fact, a violation."). Officer Argila formed such a properly-supported belief prior to the time he and the other officers stopped the green sedan. (Tr. at 9 ("And due to my experience in the matter, if you can make out the tint, it doesn't even come close to letting 68 percent of the light through, it's illegal.").) Since the officers had probable cause to stop the green sedan based on the suspected tint violation, the officers' initial traffic stop of the green sedan was lawful. Therefore, Garcia's motion to suppress the evidence obtained as a result of the stop is denied.

## II. *The "Patdown" Search*

■ Garcia next moves to suppress the gun recovered from his waistband during the traffic stop. When Officer Fogarty approached the green sedan as it was stopped on Montgomery Avenue, the tint on the passenger's window prevented Officer Fogarty from seeing into the passenger compartment. (Tr. at 21, 88–89). As a result, Officer Fogarty acted properly when he opened the passenger's door and ordered Garcia out of the car. *See Pennsylvania v. Mimms,* 434 U.S. 106, 111–12, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (police may order driver out of car during an otherwise legal traffic stop); *Maryland v. Wilson,* 519 U.S. 408, 410, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (extending *Mimms* to passengers); *Mollica v. Volker,* 229 F.3d 366, 369 (2d Cir.2000) ("We focus first on the constitutionality of the initial stop because if a stop is lawful, passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle."); *Dhinsa,* 171 F.3d at 723 (noting that, in course of legal stop, the officer "took [defendant's] car keys [and] opened the passenger-side front door"); *People v.*

*Edwards*, 222 A.D.2d 603, 635 N.Y.S.2d 274, 275 (2d Dep't 1995) (holding that officers were permitted to open door after stopping car for illegally tinted windows); *People v. Vasquez*, 106 A.D.2d 327, 483 N.Y.S.2d 244, 246 (1st Dep't 1984) ("The opening of the door of the car lessens to a substantial degree the risk of injury to the officer from the use of a gun by a passenger. It cannot be said, therefore, that the 'search', i.e., the mere opening of the door, was unreasonable."). Indeed, as the Fourth Circuit has wisely reasoned, the presence of tinted windows bolsters the application of this bright-line rule:

> When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. *Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.*

*United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir.1997) (emphasis in original); *accord United States v. Bold*, 19 F.3d 99, 103 (2d Cir.1994) (inability of officers to see through tinted windows, combined with a tip about a gun, permitted officers to open car door and order occupants out of the car); *see also Harrell*, 268 F.3d at 143 (in upholding search, noting that officer approaching car with tinted windows "opened its rear passenger door to see if anyone was in the back seat").

After opening the door and observing Garcia making furtive movements in an apparent attempt to conceal a "bulge" in his waist area (Tr. at 89), Officer Fogarty was justified in patting Garcia down to determine whether he was carrying a weapon. *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (patdown is permissible where an officer has "reason to believe that he is dealing with an armed and dangerous individual"); *Mimms*, 434 U.S. at 112, 98 S.Ct. 330 ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.' "); *United States v. Hamilton*, 978 F.2d 783, 785 (2d Cir.1992) (patdown held permissible where "officers saw the unusual bulge in [defendant's] pocket"); *United States v. Paulino*, 850 F.2d 93, 98 (2d Cir.1988) (defendant's furtive movement provided a legal basis for the protective search where defendant was observed "bending over as if placing an object on the floor"). Officer Fogarty's actions at each successive stage of the stop—opening the door, ordering Garcia out of the car and patting him down—were supported by his observations of Garcia's behavior and the particular circumstances surrounding the event. Therefore, Officer Fogarty's discovery of the gun pursuant to the patdown search of Garcia was entirely proper, and Garcia's motion to suppress the gun is denied.

### III. *Garcia's Statement Incident To The Arrest*

■ Garcia also moves to suppress his statement, in response to a question from Officer Fogarty immediately following the discovery of the gun, that he had ecstasy pills hidden in his groin area. (Tr. at 93, 102.) Garcia claims that he made the statement while under custodial interrogation and without being read the *Miranda* warnings. There is no question that Garcia was subject to a custodial interrogation since he was in handcuffs and being ques-

tioned by an NYPD officer. Statements made under these circumstances must normally be suppressed if not the product of a knowing and voluntary waiver of a suspect's *Miranda* rights. *See, e.g., United States v. Male Juvenile,* 121 F.3d 34, 39–40 (2d Cir.1997). However, in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court recognized a "public safety" exception to *Miranda,* which permits the admission of answers to questions posed in a limited custodial interrogation in the absence of *Miranda* warnings so long as the questions are "reasonably prompted by a concern for the public safety." 467 U.S. at 656, 104 S.Ct. 2626. The question, therefore, is whether Garcia's statement, in response to Officer Fogarty's question "is there anything else you want to tell us about," falls within this "narrow" exception to *Miranda. Quarles,* 467 U.S. at 658, 104 S.Ct. 2626.

In *Quarles,* the police pursued a rape suspect into a supermarket. The victim had told the officers that the suspect was armed, and when they apprehended the suspect, they found him wearing an empty shoulder holster. *Quarles,* 467 U.S. at 651–52, 104 S.Ct. 2626. Without giving the *Miranda* warnings, the officers asked the suspect where the gun was. Quarles eventually told the officers, who retrieved the gun from among some empty cartons. *Quarles,* 467 U.S. at 652, 104 S.Ct. 2626. In reversing the lower court's decision, the Supreme Court held that: (1) a narrow public safety exception to *Miranda* existed; and (2) the possibility that an accomplice or member of the public could discover the abandoned gun in the supermarket required the application of the exception to the facts of the case. *Quarles,* 467 U.S. at 655–56, 104 S.Ct. 2626.

While there are no controlling Second Circuit decisions, there is a disagreement among circuits that have examined the issue as to the breadth of the *Miranda* public safety exception, and the application of *Quarles* beyond the immediate facts of that case. In *United States v. Jones,* 154 F.Supp.2d 617 (S.D.N.Y.2001), District Judge Lynch comprehensively surveyed the application of *Quarles* in different circuits, an exercise that will not be repeated by this Court except to adopt Judge Lynch's conclusion that "[a] broad survey of decisions by those circuits that have construed *Quarles* reveals a strong majority tendency to apply the public safety exception in situations that go far beyond the 'loose weapon' scenario of *Quarles* and [*United States v. Khalil,* 214 F.3d 111 (2d Cir.2000)]." *Jones,* 154 F.Supp.2d at 626–29. Further, this Court also shares Judge Lynch's concern that *Quarles* should not be interpreted by courts to establish an exception that "swallow[s] the rule." Therefore, this Court adopts the *Jones* framework for application of the public safety exception, namely that the "doctrine requires, at a minimum, that the authorities have some real basis to believe that weapons are present, and some specific reason to believe that the weapon's undetected presence poses a danger to the police or to the public." *Jones,* 154 F.Supp.2d at 628–29 (holding that the exception applies to statement by handcuffed defendant giving location of a gun in an apartment where officers found loose ammunition in a closet and other members of the household, including children, were present); *accord United States v. Reyes,* 249 F.Supp.2d 277, 282 (S.D.N.Y.2003) (holding that exception does not apply to statement made by suspect as to the presence of a gun and drugs, where statement was in response to officer asking, without specific information, whether suspect had any dangerous objects on his person); *United States v. Newton,* 181 F.Supp.2d 157, 177–78 (E.D.N.Y.2002) (holding that

exception applies to statement by handcuffed parolee concerning whereabouts of a gun in an apartment where parole officers had specific information, from a third party, that a gun was likely present in the apartment).

■ The application of the *Quarles* public safety exception is warranted in this case. First, having just recovered a handgun from the defendant's waistband, Officer Fogarty had more than a "real basis to believe that weapons are present," *Jones*, 154 F.Supp.2d at 629, and was therefore justified in engaging in a limited custodial interrogation of Garcia to determine whether any more weapons were either on his person or in the car. In addition, although Garcia was in handcuffs and Felix was under Officer Argila's control at the time Garcia made his statement, the officers were not yet in complete control of the situation. They were stopped in a heavily populated, high-crime area at night (Tr. at 18, 108), and were particularly concerned about the safety threat posed by people congregating around the corner. (Tr. at 18) ("On that corner of 174 and University, there is a 24–hour bodega that a lot of people hang out there, so I didn't want to make the car stop at that location, just for tactics and safety reasons.") *Cf. United States v. Brown*, 273 F.3d 747, 748 (7th Cir.2001) ("A nighttime traffic stop, especially in an area where crime is not a stranger, is more fraught with potential danger to an officer than would be a stop during the light of day."). Therefore, Officer Fogarty was justifiably concerned that "the weapon's undetected presence pose[d] a danger to the police or to the public." *Jones*, 154 F.Supp.2d at 629; *accord United States v. Simmons*, No. 02 Cr. 314, 2003 WL 145261, at *6 (E.D.N.Y. Jan. 9, 2003) (holding that exception applies to statement by handcuffed defendant as to location of a gun in an apartment even where most of the other adults in the apartment were handcuffed because "[e]ven assuming the executing officers believed that the residence was secure ... the circumstances were still sufficiently dangerous").

Indeed, the inherent danger posed to police officers involved in traffic stops,[1] which is heightened to what one court has dubbed "the point ... of unconscionability" in cases where tinted windows obscure an officer's view into the passenger com-

---

1. *See, e.g., Mimms*, 434 U.S. at 110, 98 S.Ct. 330 (citing a study showing that "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile"); *United States v. Holt*, 264 F.3d 1215, 1223 (10th Cir.2001) ("The most recent data reveal that in 1999, 6,048 officers were assaulted during traffic pursuits and stops and 8 were killed. More than 34% of those assaults involved a dangerous weapon such as a gun or knife. Firearms were used to commit 82 of the 94 killings of law enforcement officers during traffic pursuits and stops during the 1990s. *The terrifying truth is that officers face a very real risk of being assaulted with a dangerous weapon each time they stop a vehicle.*") (citing Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 82, 28 (1999) (emphasis added)) *United States v. Shranklen*, 315 F.3d 959, 962 (8th Cir.2003) (in reversing suppression of evidence obtained during a *Terry* stop, holding "that 'minimally intrusive weapons searches' at traffic stops will more likely be reasonable because of the 'inherent danger' of traffic stops") (quoting *United States v. Menard*, 95 F.3d 9, 11 (8th Cir.1996)); *accord Maryland v. Wilson*, 519 U.S. 408, 414–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Michigan v. Long*, 463 U.S. 1032, 1047–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Foley v. Connelie*, 435 U.S. 291, 298, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978);; *Adams v. Williams*, 407 U.S. 143, 148 n. 3, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *In re Alphonso J.*, 157 A.D.2d 493, 549 N.Y.S.2d 681, 681 (1st Dep't 1990); *People v. Gonzalez*, 115 A.D.2d 73, 499 N.Y.S.2d 400, 410 (1st Dep't 1986); *Vasquez*, 483 N.Y.S.2d at 246.

partment of a car,[2] lead this Court to believe that application of the *Quarles* public safety exception should be presumed where a police officer stops a car with excessively tinted windows. Such a presumption is warranted because the danger to the officer is so elevated in the case of a traffic stop involving a car with excessively tinted windows that a "real basis to believe that weapons are present" should fairly be presumed. Such a narrow, bright-line application of the *Quarles* public safety exception would not cause it to "swallow the rule," but instead merely reflects the reality that the level of danger posed to police officers involved in traffic stops of cars with excessively tinted windows is so high that a limited custodial interrogation to determine whether any weapons are present, even in the absence of *Miranda* warnings, should be permitted. However, even if this Court did not apply such a *per se* rule, Garcia's statement would not be suppressed because, as noted above, the facts in this case amply support the application of the *Quarles* public safety exception even under the more restrictive *Jones* test. Therefore, Garcia's motion to suppress his oral statement incident to his arrest and patdown, i.e., that he had ecstasy pills hidden in his groin area, is denied. Since his statement concerning the existence and location of the ecstasy pills is admissible, his motion to suppress the pills themselves is denied as well.

However, even if Garcia's statement in response to Officer Fogarty's question were suppressed, the pills themselves would not be. *See Nix v. Williams,* 467 U.S. 431, 444 & n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received."); *accord United States v. Mendez,* 315 F.3d 132, 137–39 (2d Cir.2002) (in affirming district court's denial of suppression pursuant to inevitable discovery rule, holding that even if police officers' initial search of defendant's automobile at time of his arrest was not a valid inventory search, handgun found in glove compartment would have been inevitably discovered during valid inventory search); *United States v. Rahman,* 189 F.3d 88, 120 (2d Cir.1999) (forged passports held admissible under inevitable discovery doctrine even if their initial seizure during frisk for weapons was unreasonable because agents were authorized to arrest suspect, and "[h]is arrest for the assault would inevitably have led to the discovery and seizure of the passports that were in his pocket upon a search of his person incident to that arrest"). Since the pills in Garcia's groin area would inevitably have been discovered pursuant to a routine search of Garcia's person, either at the scene of the arrest or at the Precinct, the pills would not be suppressed under the inevitable discovery rule. (Tr. 25–26, 67; GX 6.)

## IV. *Defendant's Written Statement*

Finally, Garcia moves to suppress his alleged written statement on the grounds that he did not make any such statement, or that if he did, he was not advised of and did not waive his *Miranda* rights. After reviewing the testimony and evidence adduced at the suppression hearing, Garcia's motion is denied.

---

**2.** *Stanfield,* 109 F.3d at 981 ("Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows.").

Where a defendant moves to suppress a statement allegedly given in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Government bears the burden of proving by a preponderance of the evidence that the defendant knowingly and voluntarily waived his rights. *See, e.g., United States v. Male Juvenile*, 121 F.3d 34, 39–40 (2d Cir.1997). The Government has met its burden in this case. All three officers testified that Officer Argila read the *Miranda* warnings to Garcia, and Officer Argila testified that Garcia acknowledged that he understood each warning, and that Garcia read and signed the statement after it was completed. (Tr. at 32–33, 69–71, 98, 113, 128–29.) The Court has no basis upon which to doubt the credibility of the officers, and representations such as these are sufficient to support a knowing waiver of *Miranda* rights. *See, e.g., United States v. Gaines*, 295 F.3d 293, 298 (2d Cir.2002) (declining to suppress defendant's statement, even though defendant did not sign form acknowledging that he received *Miranda* warnings, where arresting officer testified, *inter alia*, that he read warnings to defendant from a form and that defendant verbally acknowledged his understanding of each right). Further, the statement contains a number of details that would be known to Garcia but not the officers, such as the purchase price of the green sedan and the number of children Garcia has. (Tr. at 153–54; GX 2.) This further bolsters this Court's conclusion that Garcia did in fact make, in sum and substance, the statement offered as Government Exhibit 2.

To rebut this showing, defendant does not specifically aver that he made no statement. Instead, Garcia offers the rhetorical sleight-of-hand that "[t]he officers own paperwork makes clear that I made no statement and asked for a lawyer." (Affidavit of Luis Garcia, dated April 15, 2003

("Garcia Aff.") ¶ 4.) The paperwork to which Garcia refers is the Bronx County District Attorney's criminal case jacket, which indicates that Garcia made no statement and asked for a lawyer. (DX A.) Undermining Garcia's position, however, is the fact that ADA Coyne testified that she had no present recollection as to the relevant portions of her conversation with Officer Fogarty. (Tr. at 141–42.) Instead, ADA Coyne merely assumed that Officer Fogarty told her that Garcia had made no statement and asked for a lawyer based on "her practice" and the notations on the jacket. (Tr. at 141.) This supposition, which does not account for the possibility of clerical mistakes in a busy prosecutor's office, is in contrast to the specific, uniform recollections of Officers Argila, McCarthy and Fogarty, who each testified in detail about Garcia's receipt and subsequent waiver of his *Miranda* rights, and the drafting and ratification of his statement. (Tr. at 33–39, 98–101, 128–29.) As this Court has no reason to doubt the credibility of the three officers in this case, their specific recollections trump ADA Coyne's bare assumption that the criminal file jacket accurately represents her conversation with Officer Fogarty. *See United States v. Martinez*, 634 F.Supp. 1144, 1147 (S.D.N.Y.1986)(holding that police officer's sworn affidavit that *Miranda* warnings were given was held sufficient to deny suppression of defendant's post-arrest statement in the absence of properly-supported statement by defendant to the contrary); *see also United States v. Patterson*, No. 02 Cr. 283(WHP), 2002 WL 31890950, at *5 (S.D.N.Y. Dec. 27, 2002) ("[Defendant's] lack of a present recollection of being informed of his *Miranda* rights, coupled with [the agent's] specific recollection ... that [defendant] was read his *Miranda* rights by [another agent], is sufficient for this Court to conclude that

[defendant] properly received his *Miranda* warnings."); *Agugliaro v. Brooks Bros., Inc.*, 927 F.Supp. 741, 745 n. 4 (S.D.N.Y. 1996)(when presented with defendant's "specific recollection" and "plaintiff's lack of recollection of what he said at the first meeting," reasonable jury "could only" accept defendant's account of the meeting). This Court finds that Garcia was advised of his *Miranda* rights, that he knowingly and voluntarily waived them, and that he made, in sum and substance, the statement offered in Government Exhibit 2. Therefore, Garcia's motion to suppress his written statement is denied.

## CONCLUSION

For the reasons set forth above, defendant Luis Garcia's motion to suppress evidence seized pursuant to a traffic stop and search, as well as oral statements made incident to his arrest and a written statement made while in custody, is denied.

SO ORDERED.