UNITED STATES of America,

v.

Mark SELDINAS, Defendant.

No. 12–CR–111–A.

United States District Court, W.D. New York.

Signed Nov. 24, 2014.

Herbert L. Greenman, Buffalo, NY, for Defendant.

## ORDER

RICHARD J. ARCARA, District Judge.

This case was referred to Magistrate Judge Jeremiah J. McCarthy, pursuant to 28 U.S.C. § 636(b)(1)(B) for pretrial proceedings. Defendant Mark Seldinas filed a motion to suppress (Dkt. No. 22) physical evidence and certain statements he had made during his arrest on November 5, 2011. A suppression hearing was held on October 7, 2013, the parties submitted post-hearing briefs, and oral argument was held on August 21, 2014. Magistrate Judge McCarthy filed a Report and Recommendation (Dkt. No. 71) on October 23, 2014 recommending that defendant Mark Seldinas' motion to suppress (Dkt. No. 22) be granted.

Pursuant to 28 U.S.C. § 636(b)(1), the Court has reviewed the Report and Recommendation. It is hereby

**ORDERED,** for the reasons set forth in Magistrate Judge McCarthy's Report and Recommendation, defendant Seldinas' motion to suppress his November 5, 2011 statements is granted. The Report and Recommendation (Dkt. No. 71) is therefore adopted in its entirety.

The parties shall appear for status conference/meeting to set trial date on November 26, 2014 at 10:00 AM before Hon. Richard J. Arcara.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

JEREMIAH J. McCARTHY, United States Magistrate Judge.

Defendant Mark Seldinas is charged in an Indictment [12] [1] with knowingly, intentionally, and unlawfully possessing with intent to distribute a Schedule II controlled substance (Oxycodone); and a Schedule IV controlled substance (Alprazolam), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 842(b)(2). Before me is Seldinas' motion to suppress physical evidence and statements from his November 5, 2011 arrest. Greenman Declaration [22], §§ XI and XII.[2] A suppression hearing was held on October 7, 2013 at which Drug Enforcement Agency ("DEA") Special Agent ("SA") Shane Nastoff and DEA Task Force Officer John Trabert testified for the government [59]. The parties submitted post-hearing briefs [63, 64], and oral argument was held on August 21, 2014[68]. For the following reasons, I recommend that the motion be granted.

### HEARING TESTIMONY

**SA Nastoff** testified that on November 4, 2011 he was involved in a drug trafficking investigation and was using a confidential source ("CS"), who was in contact with an individual in the Bronx to arrange for the purchase of 200 Oxycodone and 120 Xanax pills. October 7, 2013 hearing transcript [59], pp. 7–8. That individual arranged for Seldinas to transport the pills to Buffalo and he was scheduled to meet the CS on November 5, 2011 (*id.*, p. 8). On November 5, 2011, the CS informed SA Nastoff that he had been in contact with Seldinas by text messaging (gov. ex. 2 [50–1]) and that they had arranged to meet later that evening at the Boulevard Mall, in Amherst, New York to conduct the drug transaction. October 7, 2013 hearing transcript [59], pp. 9–10. In one of the text messages, the CS stated, "5200 right? 200 jetseys and 120 shirts?" (*id.*, p. 11; gov. ex. 2 [50–1], p. 1). SA Nastoff testified that the CS explained to the agents that "5200" referred to the $5,200 he was going to pay Seldinas and further explained that the "200 jetseys" referred to 200 Oxycodone pills, while the "120 shirts" referred to 120 Xanax pills. October 7, 2013 hearing transcript [59], pp. 11–12.

Agents searched the CS and his vehicle to verify that he was not in possession of any drugs or weapons (*id.*, p. 12). The agents also equipped the CS with a Kel transmitter so that he could transmit live audio to the agents (*id.*, pp. 12–13). The agents then followed the CS in a separate vehicle to the parking lot of Michael's department store next to the Boulevard Mall, where the CS and Seldinas had agreed to meet (*id.*, pp. 13–14). While the CS and agents were traveling to this location, Seldinas contacted the CS to confirm that they were meeting at Michael's department store, which SA Nastoff overheard via the Kel monitor (*id.*, p. 14).

SA Nastoff testified that the officers wanted "some type of evidence" that the drugs were actually present on Seldinas before they arrested him (*id.*, p. 31). According to SA Nastoff, this did not mean that the agents needed to observe drugs

---

1. Bracketed references are to CM/ECF docket entries.

2. At the August 21, 2014 oral argument, Seldinas' counsel agreed that all other portions of Seldinas' pretrial motion [22] were moot. August 21, 2014 Text Order [68].

before they would arrest Seldinas, but rather "any type of statements that would have indicated that he did have the drugs" would have sufficed (*id.*).

Upon reaching Michael's department store at approximately 7:17 p.m., the CS parked in the middle of the parking lot, exited his vehicle, and stood near the hood of the car (*id.*, p. 15). The parking lot "was well-lit" and SA Nastoff had a clear view of the CS (*id.*). Other law enforcement officers were surveilling the parking lot from different vantage points and they were communicating by radio (*id.*, pp. 15–16).

While observing the CS, SA Nastoff overheard via the Kel monitor the CS receiving a telephone call (*id.*, p. 16). SA Nastoff testified that it sounded as if the CS was directing an individual to his specific location and Seldinas was observed in the parking lot talking on his cell phone walking towards the CS (*id.*). The two met in front of the CS's vehicle and greeted each other (*id.*). SA Nastoff testified that he overheard Seldinas, via the Kel monitor, state "that he had the 200 Oxycodone pills and two prescription bottles" (*id.*, pp. 16–17).[3] After hearing that Seldinas was in possession of the pills, SA Nastoff or SA Wisniewski "gave out [a] radio transmission to move in and make an arrest" (*id.*, pp. 32–33). He did not remember exactly what was said to Seldinas as the officers approached, though he did recall that they were all stating "police" to

identify themselves (*id.*, p. 33). He testified that he approached Seldinas with his weapon drawn, but could not recall if either Officer Trabert or SA Wisniewski had their weapons unholstered (*id.*). SA Nastoff was wearing a DEA bullet-proof vest, which had a badge and the word "police" displayed (*id.*, p. 35).

Officer Trabert was the first officer to reach Seldinas, though the others were only seconds behind him (*id.*, pp. 17–18). When SA Nastoff reached Seldinas, he was already in the process of being handcuffed (*id.*, pp. 18, 36). Officer Trabert advised SA Nastoff that Seldinas had "dropped a plastic baggie containing pills on the ground at his feet" (*id.*, p. 18). SA Nastoff testified that he observed a clear "ziplock type bag" containing "multiple pills that were blue in color" (gov. ex. 3 [50–1], p. 4 (left side of the photograph)) at Seldinas' feet, but did not observe the bag fall to the ground. October 7, 2013 hearing transcript [59], pp. 18–19.

After Officer Trabert handcuffed Seldinas, SA Nastoff witnessed him advise Seldinas of his *Miranda* rights and Seldinas agreed to waive his rights and speak with the officers (*id.*, pp. 19–20). Seldinas stated that he had an additional baggie containing pills in the center console of his vehicle (*id.*, p. 37), and SA Nastoff proceeded to Seldinas' vehicle so that he could take possession of it, as well as the additional pills (*id.*, pp. 20–21, 37). There were

---

**3.** Because Seldinas was not supplied with a copy of the recording from the Kel monitor prior to the hearing, I directed him to advise me by October 11, 2013 whether he wished to reopen the suppression hearing based upon his review of that recording. November 7, 2013 Text Order [51]. Although Seldinas never asked to reopen the hearing, he now relies upon that recording in his post-hearing brief to argue that it does not corroborate SA Nastoff's testimony that he heard Seldinas state "that he had the 200 Oxycodone pills and two

prescription bottles". At oral argument, I requested the government to provide me with a copy of the recording. August 21, 2014 Text Order [68]. Based upon my review of that recording, I agree that this was not expressly stated by Seldinas. Nonetheless, it is unnecessary for me consider whether the audio recording should be considered or the hearing reopened, since the government does not rely upon what SA Nastoff allegedly heard as establishing probable cause for the arrest.

two occupants in the vehicle and he asked them to exit the vehicle while he retrieved the pills from the center console (*id.*, p. 20). SA Nastoff testified that he did not remember whether the console was open when he first approached the vehicle (*id.*, p. 38).

After SA Nastoff took possession of the additional pills contained in the vehicle (gov. ex. 3 [50–1], p. 4 (right side of the photograph)), Seldinas and his vehicle were taken to the Amherst Police Department. October 7, 2013 hearing transcript [59], pp. 21, 23. Though the vehicle was impounded because of its use in a drug transaction, the agents ultimately decided that it would not be seized, and released it to Seldinas' girlfriend, who was an occupant in the vehicle (*id.*, pp. 25–26).

At the Amherst Police Department, Seldinas was placed in interview room, where he was questioned by SA Nastoff, Officer Trabert, and SA Wisniewski about his drug trafficking activities and he agreed to provide additional information (*id.*, pp. 23–24). SA Nastoff was unable to recall if Seldinas was Mirandized again before this interview occurred (*id.*, p. 23).

During the interview, Seldinas provided information about this drug transaction and agreed to cooperate with respect to future investigations (*id.*, pp. 24–25). At no time on November 5, 2011 did Seldinas ask for the interview to cease or request an attorney (*id.*, p. 25). Ultimately, Seldinas cooperated against the individual that sent him to Buffalo, who was eventually arrested and prosecuted in the Western District of New York (*id.*, pp. 40–41).

**Officer Trabert** testified that in November 2011 he was assisting SA Nastoff in a prescription pill trafficking case (*id.*, pp. 45–46). He was instructed by SA Nastoff to report to Michael's department store because the DEA "needed extra bodies for surveillance and arrest" (*id.*, p. 46). He

was briefed on the background of the case prior to conducting surveillance and was aware the CS was scheduled to meet an individual at this location (*id.*, p. 47). Officer Trabert positioned his vehicle near the front of the store so that he would have a clear view of the CS (*id.*). Because he was conducting surveillance alone in his vehicle without a Kel monitor, Officer Trabert was relying upon his radio communications with SA Nastoff to know what was occurring (*id.*, pp. 46–48).

During his surveillance, Officer Trabert observed Seldinas approach the CS (*id.*, p. 48). The two men spoke for about a minute before Officer Trabert and the other agents were given orders via the radio "to approach and arrest" (*id.*, pp. 48, 58). Officer Trabert testified that he was the first officer to reach Seldinas, though the other officers were just a few seconds/steps behind him (*id.*, pp. 48–49).

As Officer Trabert approached Seldinas, he observed him drop "a sandwich bag" to the ground (*id.*, p. 50). He testified that "it just seemed like it dropped from his body to the ground" (*id.*). At the time Seldinas dropped the bag, there were no law enforcement officers physically touching him, nor had he been seized in any way (*id.*, pp. 50, 64). Officer Trabert estimated that he was approximately twenty-five feet away from Seldinas when this occurred (*id.*). The following exchange occurred concerning what Officer Trabert observed in the bag:

"Q. As you get closer to the defendant did you observe what that baggie contained?

A. As I approached—I didn't know exactly what it contained, no.

Q. As you approached what, if anything, did you do or say to the defendant?

A. I restrained him and placed him under arrest and handcuffed him, and then by that time other officers were arriving" (*id.*, p. 51).

Officer Trabert was casually dressed with a vest that prominently displayed the word, "police" (*id.*, p. 49). As he approached Seldinas, several people were saying " 'DEA, police, don't move, get down' " (*id.*, pp. 51, 63). Officer Trabert could not recall whether he unholstered his weapon as he approached Seldinas (*id.*, pp. 58–59). The other officers were "coming from all different directions" (*id.*, p. 63). Officer Trabert testified that he was the first officer to reach Seldinas and he pushed him against the side of the car and placed him in handcuffs (*id.*, pp. 51, 63). Seldinas did not fight with Officer Trabert (*id.*, p. 64). Seldinas was advised of his *Miranda* rights by Officer Trabert "shortly after being placed into custody" (*id.*, p. 51). Officer Trabert recited these warnings by memory, testifying that he knew them "by heart" (*id.*). Seldinas responded affirmatively when he was asked if he acknowledged his rights (*id.*). However, when Officer Trabert was questioned whether he asked Seldinas if he would speak to them, he testified, "I don't believe if I asked directly. I'm sure there was another agent that did because I wasn't sure what was going to happen after the arrest" (*id.*, pp. 51–52). When the other agents arrived, Officer Trabert informed SA Nastoff about the bag he observed, which he believed SA Nastoff picked up (*id.*, p. 52).

After advising Seldinas of his *Miranda* rights (*id.*, p. 54), Officer Trabert patted down Seldinas and asked him if he had anything else on him (*id.*, p. 52). In response, Seldinas stated that he had "some bottles", which Officer Trabert located in his jacket (*id.*, pp. 52–53; gov. Ex. 4 [50–1], p. 5). Officer Trabert testified that Seldinas was cooperative; he never indi-

cated that he wanted his attorney or that he wanted to stop speaking (*id.*, pp. 54–55). The issue of Seldinas providing cooperation first came up in the parking lot "shortly after the time of arrest" (*id.*, p. 60). Officer Trabert was unable to recall whether someone mentioned to Seldinas that there would be benefits for him if he cooperated (*id.*).

Following his arrest, Seldinas was transported to the Amherst Police Department, where he was interviewed by Officer Trabert, SA Nastoff, and another officer (*id.*, pp. 55–56). However, Officer Trabert was unable to recall if he was Mirandized at the station (*id.*). Shortly after being brought back to the Amherst Police Department Seldinas began to cooperate with police (*id.*, pp. 60–61).

### ANALYSIS

#### A. Was there Probable Cause for Seldinas' Arrest?

■ "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant in fact subjected him to a ... seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence that the ... seizure did not violate the Fourth Amendment." *United States v. Hemingway*, 2007 WL 2245896, *6 (W.D.N.Y.2007). *See United States v. Allen*, 2013 WL 1736665, *3 (D.Vt.2013) ("The Government bears the burden of justifying Defendant's warrantless arrest").

■ At the outset of the evidentiary hearing, the government acknowledged that the issue in the hearing was "solely whether there was probable cause to arrest the defendant". October 7, 2013 hearing transcript [59], p. 4. "[A] warrantless arrest by a law officer is reasonable under

the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). "Probable cause must exist at the time of arrest; the officers may not use facts which were learned only after the arrest to establish probable cause." ' *United States v. Thevis*, 469 F.Supp. 490, 503 (D.C.Conn.1979), *aff'd*, 614 F.2d 1293 (2d Cir.1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980).

Although SA Nastoff testified that the directive to arrest Seldinas was triggered by his overhearing Seldinas state that he was in possession of the pills (October 7, 2013 hearing transcript [59], pp. 31–33), the government argues that it was the subsequent dropping of the bag of pills by Seldinas that elevated reasonable suspicion to probable cause. *See* Government's Post–Hearing Memorandum of Law [64], p. 5 of 9 ("[T]he DEA agents were justified in, at least, stopping the defendant to conduct an investigation into his suspected drug dealing and possession of pills. This reasonable suspicion immediately rose to probable cause once the defendants dropped the plastic bag of pills to the ground as the Agents approached"). According to the government, "[a]s the agents approached the defendant, TFO Trabert observed the defendant drop a sandwich bag *filled with pills.*" *Id.*, p. 3 of 9 (emphasis added). Indeed, "[i]f one or more of the police officers ... witnessed the defendant drop the transparent bag appearing to contain drugs as they approached, that observation would be sufficient to establish ... probable cause sufficient to justify the subsequent search." *United States v. Williams*, 2007 WL 643051, *3 (E.D.N.Y.2007).

However, Officer Trabert's initial observation was only that Seldinas had dropped "what looked like a sandwich bag to the ground", conceding that he "didn't know exactly what it contained" as he approached Seldinas. October 7, 2013 hearing transcript [59], pp. 49–51. There is no indication from his testimony as to whether he observed that the bag contained pills prior to or after he had arrested Seldinas. It appears that Officer Trabert was acting entirely on SA Nastoff's direction to arrest Seldinas, which occurred prior to any observation of the bag falling from Seldinas' person or observation of pills.

SA Nastoff's testimony also does not establish when the agents observed the pills. Indeed, he testified that he did not observe the bag fall to the ground (*id.*, p. 34), but was at some point alerted by Officer Trabert that Seldinas had dropped a bag containing pills on the ground at his feet (*id.*, pp. 18, 34).

Since it is not evident from the record when law enforcement observed that Seldinas had dropped a bag *containing pills*— the point at which the government argues that reasonable suspicion became probable cause—I conclude that the government has failed to meet its burden of establishing by a preponderance of the evidence that probable cause existed for Seldinas' arrest.

**B. What Evidence Should be Suppressed as a Result of the Illegal Arrest?**

 Seldinas argues that "the illegal seizure of [him] and the pills taints all of the officer's later action". Seldinas' Post–Hearing Memorandum of Law [63], p. 15 n. 5. "Evidence obtained from an unlawful ... seizure is generally subject to exclusion as 'fruit of the poisonous tree.' " *Mosby v. Senkowski*, 470 F.3d 515, 520 (2d Cir.2006), *cert. denied*, 552 U.S. 836, 128 S.Ct. 75, 169 L.Ed.2d 56 (2007). *See United States v. Mattiex*, 2006 WL 2741645, *3

(S.D.N.Y.2006) ("Where an arrest is illegal, *i.e.,* not supported by probable cause, evidence obtained as a result of that arrest may be suppressed as 'fruit of the poisonous tree' ").

■ In determining whether evidence obtained from an illegal seizure should be suppressed, "[t]he relevant constitutional question is 'whether the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint'." *Id. (quoting United States v. Ceccolini,* 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978)). Factors relevant to this inquiry include: "(1) the administration of *Miranda* warnings; (2) '[t]he temporal proximity of the arrest and the confession'; (3) 'the presence of intervening circumstances'; and (4) 'particularly, the purpose and flagrancy of the official misconduct.' " *Id. (quoting Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

■ "The Government bears the burden of proving a break in the causal chain." *United States v. Murphy,* 778 F.Supp.2d 237, 255 (N.D.N.Y.2011), *aff'd,* 703 F.3d 182 (2d Cir.2012). *See United States v. Guzman,* 724 F.Supp.2d 434, 444 (S.D.N.Y. 2010) ("The burden of proving that the statements were sufficiently attenuated to remove the taint from the unlawful search is on the government").

## 1. The Bag of Pills

■ In an attempt to avoid suppression of the bag of pills, the government argues that "[a] warrantless seizure of abandoned property does not offend the Fourth Amendment .... especially ... when an individual discards property during a police approach or chase". Government's Post–Hearing Memorandum of Law [64], p. 5 of 9 (*citing California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). However, in *Hodari D.,* the Supreme Court held that an abandonment occurred where, *prior* to be being seized, the defendant discarded drugs while fleeing from law enforcement. 499 U.S. at 629, 111 S.Ct. 1547 (Since "Hodari ... was not seized until he was tackled[,] [t]he cocaine abandoned while he was running was in this case not the fruit of a seizure"). *See United States v. McCullough,* 2013 WL 6022096, *10 (E.D.Tenn.2013) ("A defendant who abandons contraband prior to his seizure cannot challenge its admission even if the abandonment was prompted by unlawful police conduct"). Here, by contrast, any abandonment of the pills occurred *during* Seldinas' seizure. Although Seldinas was not physically restrained at the time he dropped the bag, he was complying with law enforcement's commands and show of force. *See* Seldinas' Memorandum of Law [63], pp. 10–11; *Hodari D.,* 499 U.S. at 626, 111 S.Ct. 1547 ("An arrest requires either physical force ... or, where that is absent, submission to the assertion of authority").

The other cases relied upon by the government are equally distinguishable. *See* Government's Post–Hearing Memorandum of Law [64], p. 5 of 9 (*citing United States v. Welbeck,* 145 F.3d 493, 498 (2d Cir.), *cert. denied,* 525 U.S. 892, 119 S.Ct. 212, 142 L.Ed.2d 174 (1998) (finding abandonment where the defendant "repeatedly and expressly disclaimed any possessory interest in the Gap bag"); *United States v. Washington,* 677 F.2d 394, 396 (4th Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 120, 74 L.Ed.2d 105 (1982) ("When [the defendant] three times denied that the bag belonged to her, and then specifically stated 'It's not my bag, I don't care what you do,' the agents could justifiably rely on her statements to think they would not violate her rights by opening the bag")). Therefore, I

conclude that the seized bag of pills is the fruit of Seldinas' illegal arrest.

## 2. Seldinas' Statements

 Although the government points to the fact that Seldinas was Mirandized, this occurred *after* he openly dropped the incriminating evidence at his feet. "Once a defendant thinks that he has been caught 'red handed,' the futility of remaining silent can be more easily exploited by law enforcement. This is because the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak.'" *United States v. Griswold*, 2011 WL 7473466, *11 (W.D.N.Y.2011) (Feldman, M.J.) (*quoting* 6 Wayne R. La-Fave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(c) at 306 (4th ed.2004)).

 Beyond pointing to the fact that Seldinas was Mirandized, the government makes no attempt to address why his statements were not tainted as fruit of the illegal arrest. Therefore, I conclude that the government failed to meet its burden of establishing that Seldinas' statements are not fruit of the poisonous tree.[4]

 Even if Seldinas' statements are determined not to be fruit of an illegal arrest, I would conclude that these statements should be suppressed. In support of his motion to suppress statements, Seldinas' counsel argued that Seldinas was "unable to recount specifically all of the *Miranda* warnings which were provided to him". Greenman Declaration [22], ¶ 116. Although I requested an affidavit (or declaration) from Seldinas supporting his entitlement to an evidentiary hearing on this

issue (December 6, 2012 minute entry [32] ), none was submitted. Moreover, at the outset of the hearing—after the government advised that it understood that the hearing was to address whether there was probable cause to arrest Seldinas, as well as Seldinas' statements—I expressed my skepticism as to whether the burden could shift to the government and thereby entitle Seldinas to an evidentiary hearing on this issue where he could not recall which warnings were provided. October 7, 2013 hearing transcript [59], pp. 4–5.

Nonetheless, in his post-hearing brief Seldinas argues that "[t]he exact warnings which were provided to [him] was never adduced at the suppression hearing" (Seldinas' Post Hearing Memorandum of Law [63], p. 17), and the government does not dispute that this issue was properly the subject of the evidentiary hearing. Instead, it concedes that it "must prove by a preponderance of the evidence that a defendant knowingly waived his *Miranda* rights", arguing that "the record clearly establishes that defendant was fully advised of his *Miranda* rights, and that he knowingly and voluntarily waived those rights". Government's Post Hearing Memorandum of Law [64], pp. 6–7 of 9.

Officer Trabert testified that he administered *Miranda* warnings to Seldinas by memory, but no testimony was elicited as to the precise rights that were told to Seldinas. This is insufficient to meet the government's burden, especially since the issue raised in Seldinas' motion was the content of the warnings, rather than whether warnings had been given at all. *See Moll v. United States*, 413 F.2d 1233,

---

4. Although not specifically addressed by either party, during the pat down of Seldinas, pills were recovered from his jacket. " 'When evidence is seized during a search of the person after an illegal arrest, it will be suppressed as the tainted product of the unlawful

police action, unless the prosecution carries its burden of showing that the taint has been purged.' " *Mattiex*, 2006 WL 2741645 at *3, n. 53 (*quoting United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir.1983)).

1238 (5th Cir.1969) ("While there was testimony that the police officers read to appellant a card concerning his rights, the evidence does not demonstrate that a constitutionally adequate warning was given. The government's burden may not be met by presumptions or inferences that when police officers read to an accused from a card they are reading *Miranda* warnings, or that what is read, without revelation of its contents, meets constitutional standards"); *United States v. Gilmer,* 793 F.Supp. 1545, 1555–56 (D.Colo.), *recon. granted in part,* 814 F.Supp. 44 (D.Colo. 1992) ("General, conclusory statements such as those recited above are not sufficient to discharge the Government's burden of proving that *Miranda* warnings were given .... [O]nly with specific testimony can the court decide whether the officers conveyed all of the proper warnings and whether the statement in question was admissible"); *United States v. Krehbiel,* 2009 WL 1032802, *6 (D.Utah 2009), *aff'd,* 378 Fed.Appx. 832 (10th Cir. 2010) (unpublished) ("The government has not met its burden to show that Mr. Krehbiel was adequately informed of his rights. The only evidence before the court is Detective Miller's testimony that he 'advised ... Mr. Krehbiel of his rights.' ... The government did not offer any evidence of the content of the rights nor how Detective Miller explained them to Mr. Krehbiel. There is no evidence that Detective Miller

knew the *Miranda* rights and could explain them. Such general and conclusory statements, absent any support, are insufficient for the court to find that Mr. Krehbiel was fully and adequately advised of his rights. Accordingly, all statements made after Mr. Krehbiel's formal arrest are inadmissible").[5]

### 3. The Pills Recovered from Seldinas' Vehicle [6]

▬▬ The search of Seldinas' vehicle resulted directly from his post-*Miranda* statements advising the agents that he had an additional bag of pills in the console of his vehicle. October 7, 2013 hearing transcript [59], p. 37. Since I have concluded that those statements were fruit of the illegal arrest, I reach the same conclusion concerning the pills recovered from Seldinas' vehicle. However, even if the pills recovered from the vehicle were not determined to be fruit of an illegal arrest, for the following reasons I would still conclude that this evidence was improperly seized.

▬▬ It is the government's burden to demonstrate that the warrantless search of Seldinas' vehicle was within one of the exceptions to the warrant requirement. *See United States v. Ferguson,* 130 F.Supp.2d 560, 565 (S.D.N.Y.2001). "One such exception is a search incident to an arrest." *Id.* The government argues that

---

**5.** *See also United States v. Greenaway,* 2008 WL 5691020 (W.D.N.Y.2008), where Magistrate Judge Hugh B. Scott similarly concluded that "although Ulmer testified that he read the Miranda rights to Smart from a card that he keeps in his wallet, he did not testify as to the specific language or content of the warnings on the card, he did not produce the card, and none of the exhibits moved into evidence by the government corroborate the fact that Ulmer read the warnings to Smart.... Here, the defendant does challenge the sufficiency of the rights provided .... Based upon the record in this case, the Court cannot conclude

that the government has satisfied its burden to establish by a preponderance of the evidence that adequate *Miranda* warnings were administered". *Id.,* *8. On objections to this portion of Judge Scott's Report and Recommendation, District Judge William M. Skretny recommitted the case to Judge Scott for further factual development of this issue. *United States v. Greenway,* 2009 WL 539907, *2 (W.D.N.Y.2009).

**6.** The government does not contest Seldinas' standing to contest the search of the vehicle.

"[w]hen there is a lawful arrest, the arrestee and everything worn by him may be searched .... This includes clothing that the arrested individual is wearing ..., as well as his automobile". Government's Post–Hearing Memorandum of Law [64], p. 6.[7] In support of this argument, the government relies upon *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which held that police may conduct a warrantless search, incident to arrest, of the space within an arrestee's immediate control, and upon *New York v. Belton*, 453 U.S. 454, 456, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), which extended that search incident to arrest exception to the vehicle context. *Id.*

However, neither *Chimel* nor *Belton* establish that a vehicle may always be searched incident to a recent occupant's arrest. *See* Seldinas' Post–Hearing Memorandum of Law [63], p. 15. Indeed, the Supreme Court has subsequently held that the "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." *Arizona v. Gant*, 556 U.S. 332, 351, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). Since the

government makes no attempt to establish why either of these circumstances apply here or that another exception to the warrant requirement applies, I would conclude that this evidence was improperly seized.

## C. Is Suppression the Proper Remedy?

 "The fact that a Fourth Amendment violation occurred *i.e.*, that a search or arrest was unreasonable does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). *See United States v. Julius*, 610 F.3d 60, 66 (2d Cir.2010) ("[A]pplication of the exclusionary rule is not a matter of right upon a finding that an improper search has taken place"); *United States v. Ganias*, 755 F.3d 125, 136 (2d Cir.2014). "[T]he exclusionary rule is not an individual right and applies only where it results in appreciable deterrence". *Id.* at 141. "In addition, the benefits of deterrence must outweigh the costs." *Id.* Therefore, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system .... [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct." *Id.* at 144.

While it is not evident whether Herring applies to these circumstances[8], this is not

---

7. Although Seldinas also argues that the warrantless search of the vehicle was not a valid inventory search or permissible under any forfeiture theory, the government does not rely on these grounds as supporting the warrantless search of the vehicle. Seldinas' Post Hearing Memorandum of Law [63], pp. 16–17.

8. *See United States v. Stokely*, 733 F.Supp.2d 868, 906 (E.D.Tenn.2010) ("Unlike the officers in *Herring* who relied upon the representation of other law enforcement personnel

that an arrest warrant was outstanding or the officers executing the search warrant in *Leon* who relied upon the judge's determination that probable cause to issue a search warrant existed, Detective Gibson made the decision to detain Mr. Stokely at the scene based upon her and her fellow officers' assessment that such detention was necessary and legal. Thus, the Fourth Amendment violation in this case resulted from the deliberate action of law enforcement and is of a type that could be deterred by exclusion of the evidence");

an issue that is necessary for me to resolve. It is the government's "burden [to prove] that the exclusionary rule is not 'a proper remedy for the violation' of the Fourth Amendment" (*United States v. Anderson,* 2012 WL 3535771, *6 (W.D.N.Y.)), *adopted* 2012 WL 3528971 (W.D.N.Y.2012) (*citing Julius,* 610 F.3d at 66), and it has made no attempt to satisfy that burden.

## CONCLUSION

For these reasons, I recommend that Seldnas' motion to suppress physical evidence and statements (Greenman Declaration [22], §§ XI and XII) be granted. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by November 10, 2014 (applying the time frames set forth in Fed.R.Crim.P. ("Rules") 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not,

presented to the magistrate judge in the first instance. *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

DATED: October 23, 2014.

---

*United States v. Barclay,* 2011 WL 1595065, *5 n. 5 (E.D.Mich.), *adopted,* 2011 WL 1627072 (E.D.Mich.2011) ("I have been unable to locate a single case, either federal or state, applying the good faith exception to an officer's own mistaken conclusion that the facts known to the officer sufficed to establish reasonable suspicion or probable cause.... Indeed, such a conclusion would be nonsensical"); *United States v. Moore,* 2009 WL 2929419, *7 (E.D.Tenn.2009) ("[T]he Court determines that *Herring* does not apply to this case. Here, the officers did not search defendant incident to what they believed to the be a lawful arrest. Instead, the officers intentionally searched defendant's person under circumstances which did not amount to reasonable suspicion and without defendant's consent. In order for the search to be lawful, the officers were required to have reasonable suspicion that defendant was armed and dangerous or obtain defendant's consent prior to searching his person. Because the conduct of the officers was intentional and they should have known it was unlawful, exclusion of the evidence in this case will have a deterrent effect on officers").